McGARRH *v.* STATE

No. 42396 January 14, 1963 148 So. 2d 494

248

*J. P. Coleman,* Ackerman: *William H. Fedric,* Grenada, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

Lee, P. J.

Everett McGarrh, on an indictment charging him with the murder of Mrs. Ida McGarrh, when the case came to issue on the merits, pled not guilty by reason of insanity at the time of the killing. The jury found him guilty as charged, but certified that they disagreed as

to the punishment. From a sentence and judgment of life in the State Penitentiary, he appealed.

The history of the case, in chronological order, before it reached the trial on the merits, was substantially as follows:

On June 5, 1960, Everett McGarrh shot and killed his wife, Mrs. Ida McGarrh. At the same time, he shot his daughter, Mrs. Virginia McGarrh Lamb, twice, and a short time later he shot himself three times. Both he and his daughter recovered.

On July 13, 1960, on his petition, the Circuit Judge of the district ordered his committal to the Miss. State Hospital for the insane at Whitfield, Mississippi, for observation, evaluation and treatment of his mental condition, his custody to be delivered to the Sheriff of Webster County at the institution when the authorities had finished with him. He was received at Whitfield on July 18, 1960; and thereafter on September 1, 1960, Dr. W. L. Jacquith, Director, in a letter to the Circuit Judge, certified that, pursuant to the order of committal, McGarrh was observed for the requisite period and that he appeared before the Hospital Staff on September 1, 1960; that the Staff was of the unanimous opinion that he was severely depressed and that the depression had reached insane proportions; that he was not competent and responsible at the time of the actual crime; and that he was not responsible at that time.

On December 6, 1960, McGarrh was indicted by the grand jury of Webster County for the murder of Mrs. McGarrh; and, on the same date, when the State sought to arraign him, his counsel objected because of the insanity of the accused. The next day, the court ordered a jury trial on the issue of present insanity; and, on the same date, on motion of the State, a qualified psychiatrist was appointed to make an examination.

Subsequently, on December 14, 1960, a jury was empaneled and the issue of present insanity was tried,

with the jury finding the defendant to be "presently insane." A judgment was entered accordingly, and the defendant was returned to the State Hospital until it might be legally determined that he had been restored to sanity.

On September 4, 1961, the Circuit Judge entered an order, reciting that he had been advised by the Superintendent of the Hospital that McGarrh had been restored to sanity, and directed the Sheriff of Webster County to transfer him to the county jail of Attala County for safekeeping to answer the State on a charge of murder.

At the November 1961 Term of the Circuit Court of Webster County, the defendant pled not guilty for the reason that he was insane at the time of the commission of the alleged offense, and filed his motion for a change of venue. This motion was sustained, and the venue was changed to Grenada County. Thereafter the cause was tried in the circuit court of that county, when the sole issue for determination by the jury was whether or not the defendant, at the time of the killing, was able to distinguish the difference between right and wrong. The result of the trial, with the appeal therefrom, has already been stated above.

Appellant assigns and argues here that the court erred in (I) refusing his requested peremptory instruction of not guilty; that (II) the verdict of guilty was against the overwhelming weight of the evidence, and should have, therefore, been set aside and a new trial granted; that (III) the hypothetical question to Dr. Waldron as to defendant's sanity on June 5, 1960, erroneously included hypotheses unsupported by any testimony and omitted undisputed facts favorable to him; that (IV) it was reversible error to allow the State, in rebuttal and over objection, to introduce evidence as to the defendant's use of whiskey and his improper association with women other than his wife; that

(V) it was reversible error to allow Dr. Waldron, over objection, to testify that the defendant, when he examined him, invoked his constitutional right not to discuss the alleged crime, and when the court refused to order a mistrial after the special prosecutor commented thereon in his argument; that (VI) it was prejudicial error to allow the State to offer some evidence as to the drinking and sanity of the defendant on its case in chief and then permit many witnesses to testify on those features in rebuttal after the defense had rested his case; and that the court erred (VII) in overruling defendant's motion to abate the prosecution and dismiss the same.

Before beginning a summary and analysis of the facts and circumstances in this case, it is well and proper first to state some of the legal principles which are directly applicable in the determination of the present problem.

██ █ In Smith v. State, 95 Miss. 786, 49 So. 945, the Court adopted the following statement from 1 Wigmore on Evidence, Sec. 228, to-wit: "Where the defense is insanity, general or partial, the door is thrown wide open for the admission of evidence; every act of the party's life is relevant to the issue and admissible in evidence." Some of the cases in which the same rule was applied are: Eatman v. State, 169 Miss. 295, 153 So. 381; Hand v. State, 190 Miss. 314, 200 So. 258; Hinton v. State, 209 Miss. 608, 45 So. 2d 805, 46 So. 2d 445, appeal dismissed and certiorari denied in the Supreme Court of the United States, 340 U.S. 802, 71 S. Ct. 68, 95 L. Ed. 590; Denham v. State, 218 Miss. 423, 67 So. 2d 445. The Smith case, supra, was also cited in Elmore v. State, 143 Miss. 318, 108 So. 722; Hoye v. State, 169 Miss. 111, 152 So. 644; Pullen v. State, 175 Miss. 810, 168 So. 69; Williams v. State, 185 Miss. 449, 188 So. 316; Carter v. State, 199 Miss. 871, 25 So. 2d 470; Ratcliff v. State, 201 Miss. 259, 29 So. 2d 321; Lewis v. State, 209 Miss. 110, 46 So. 2d

78; Rogers v. State, 222 Miss. 690, 76 So. 2d 831; Johnson v. State, 223 Miss. 56, 76 So. 2d 841, 81 So. 2d 558; Keeler v. State, 226 Miss. 199, 84 So. 2d 153; Burr v. State, 237 Miss. 338, 114 So. 2d 764; Wilson v. State, (Miss.), 140 So. 2d 275.

 ■ Besides, at the moment that the proof warrants a reasonable doubt as to the ability of the accused at the time of the offense to distinguish right from wrong, it devolves upon the State, before a conviction can be had, to remove it to the satisfaction of the jury beyond reasonable doubt. Cunningham v. State, 56 Miss. 269; Bishop v. State, 96 Miss. 846, 52 So. 21; Waycaster v. State, 185 Miss. 25, 187 So. 205; Gambrell v. State, 238 Miss. 892, 120 So. 2d 758.

 ■ In addition, the rule in this State, with reference to the admission of opinions of nonexperts on the question of sanity or insanity, is that such opinions are admissible, if accompanied by a statement of the facts on which they are based, whenever the witness has had such acquaintance or opportunity for observation as is likely to make the opinion valuable. Wood v. State, 58 Miss. 741. See also Sheehan v. Kearney, 82 Miss. 688, 21 So. 41. Cf. Bailey v. State, 147 Miss. 428, 112 So. 594; McGinnis v. State, 201 Miss. 239, 29 So. 2d 109.

Mrs. Virginia McGarrh Lamb, the only child of the McGarrh marriage, at the time of the trial, had been married a year and two months. She testified that her mother had worked at a glove factory for about seven years but had quit her job and had been making a real effort to make a success of the marriage. The family had lived on a ninety-acre farm about seven or eight miles from Eupora since 1949 or 1950. Her father had been drinking excessively for about two years. He got to where he drank every day, and would fuss and gripe and would be so drunk sometimes that he would have to go to bed. Finally, she left home and got a job in

town and rented an apartment. Her mother came to her apartment the latter part of February and both of them lived off of what the witness made at her job. Her father would seek reconciliations and would promise to change his way, and her mother would return to him. After her return, there would be no change. About five different separations occurred. Finally her mother filed suit for a divorce, support, etc., and the cause was set for trial. On Sunday morning before the trial was to come up the following Tuesday, her father came to the apartment and talked to her mother one and one-half to two hours, wanting her to come back. But her mother told him that she was going through with her plans. After he left, she and her mother ''had made the rounds'' and were near their home. Her mother was driving the car. As they approached the house, they saw her father coming down the road in his pickup. He cut into the road and stopped in the middle so that they could not pass. Her mother tried to back up as he ran toward the car. She stopped and said, ''Everett, don't do it, I'll live with you.'' He said, ''No, you won't'', and he began shooting. She thought there were five shots. She was hit twice, one shot going through to the back of her neck, and the other through her nose and mouth and lodging next to her spine. She opened the door, fell out and squatted by the car until he drove off. Her mother, under the steering wheel, was killed instantly.

On cross-examination, she said that, at each reconciliation, her father would promise to quit his doings; that he was not drinking on that Sunday morning, was not disturbed, and was just as usual; that, in their rounds, they saw his truck where he said it was not going to be; that he had told them he was not going to have anything to do with this woman; and that as they started by the old home later, they saw him come out. She was asked by counsel if she had not told several

people, naming them, over and over again that her father was crazy, and she said that she did not, that "My father hasn't ever been crazy." She admitted that she had filed a suit for damages against her father, and said that she did not visit in the home because he drank so much that she did not want to be out there. She had not visited him while he was in jail or at Whitfield because he had "never been a father to her."

Sheriff S. R. Washam, upon receiving a report of the tragedy, went to the scene. He found Mrs. McGarrh, lying in the road by the side of the car, dead, and the defendant with three wounds in his breast, unconscious, beside his pickup which was parked in the driveway leading from the road to his home. In his right hand was a 22-caliber pistol, which held nine cartridges, only one of which had not been fired. He smelled liquor on the man's breath. In the house on a table, he saw a pint bottle about two-thirds full of whiskey and two glasses, which had the smell of whiskey on them. There was also a fruit jar in his shop which had had liquor in it. He carried McGarrh to the clinic. This witness had known the defendant for twenty-five years, seeing him once or twice a week. About thirty days before the killing, he had seen the defendant and talked to him fifteen or twenty minutes in connection with a replevin suit over his wife's car. He talked to the defendant several times during his stay in the hospital. On one occasion, he took him to Mantee, about twelve miles distant, to get a haircut, during which their conversation was along general lines. At no time had he ever seen any difference or peculiarity in the defendant's behaviour. On the basis of this long acquaintenanceship, observation and conservations, he had an opinion as to the defendant's sanity, and that opinion was that, on June 5, 1960, McGarrh knew the difference between right and wrong. On cross-examination he admitted that McGarrh had never had trouble of any kind. It was brought

out that the defendant was in Whitfield because he was found presently insane by a jury and he carried him back to Whitfield. He also got custody of him when he was restored to sanity.

City Marshal Bennie Ray saw the defendant after he was brought to the Clinic, smelled whiskey on his breath, and heard him, partly unconscious, calling for his mother and his wife. He had known the defendant seven or eight years, seeing him nearly every Saturday. He had an apartment in the same building where his daughter resided, and he saw the defendant at his daughter's apartment about 9:20 that Sunday morning. They spoke, but he observed nothing unusual or peculiar about him at the time.

Here the State rested.

Dr. W. L. Jacquith, Director of Miss. State Hospital at Whitfield was called as a witness for the defendant. He explained that the defendant was received at the hospital on July 18, 1960, under court order for the purpose of mental examination. He was a patient of Dr. Ritter. He was taken before the Staff on August 31, 1960, attended by fifteen doctors. Based on the history and observation, it was the unanimous opinion of those doctors that he had suffered a psychotic depressive reaction, that is, a mental disorder to the point where the victim loses contact with reality and sometimes performs brash acts against himself; and that he was not competent and responsible at the time of the examination nor at the time of the commission of the offense. His testimony detailed the report thereof, which was made to the court, the defendant's return after a court hearing, and his subsequent restoration to sanity on August 30, 1961. He explained the nature of the work of the institution and the treatment of the patient both generally and specially.

On cross-examination, the doctor stated that the history of the case was obtained from the defendant, his

mother, and his attorney. This was introduced, together with the questions and answers at the Staff meeting. The doctor conceded that, in some cases, the history is very worthwhile; but in others, the illness is so obvious that a history is not needed. The history in this instance was obtained from the only source then available. He was of the opinion that an adequate history should be obtained and that the one in this case was sufficient. It appeared therefrom that, for many years, the defendant and his wife had been somewhat incompatible. She would spy on him, did not like the neighbors, and did not want him to have anything to do with them. He had nothing against his daughter. He was greatly upset when his wife left him because he loved her very much. He was not spending time at another man's house. He did not use alcohol or drugs and had never drunk a half-gallon of liquor in his whole life. Besides, he had never ''stepped out'' on his wife in his life. The doctor said that, although this history might have been inaccurate, this would make no difference because they drew their own conclusion that he was mentally ill. He stated that sometimes case histories are worthless. He did not think that the defendant's having trouble with his daughter, or spending too much time at another man's house, or excessive use of liquor unless of long duration, would have made any difference. He said that sometimes extra-marital affairs produce feelings of guilt which precipitate mental illness. He admitted that twice it had come to their attention that the defendant had planned to escape from the hospital with a woman.

Dr. J. J. Head, as a witness for the defendant, testified that he observed and diagnosed the defendant, Everett McGarrh, and was of the opinion that he was insane on June 5, 1960, when he killed his wife and shot his daughter, and was not able to distinguish between right and wrong.

On cross-examination, he said that he saw the accused either the day he came in or the day after. Dr. Ritter, who is eligible for but has not taken his board examination, was the doctor in charge and, at the Staff meeting, read a summary of his findings. He had the entire case history. That case history had effect upon his findings. If there were incorrect statements in it and he did not discover them, they would unduly influence him. He remembered that defendant said he had not drunk over half-gallon of liquor in his lifetime. There was no information from anyone else that he did not use alcohol in any degree. He said that he took that into consideration. There was also information that he had never had an affair with another woman. This was obtained from the patient and his counsel. But he said that he did not take that answer very seriously. He had the impression that his daughter sided with her mother. He did not talk to the accused about the details of the occasion before he reached his conclusion, in fact he did not think that they were important. He said that defendant was upset at the Staff meeting, crying, but gave answers fairly well. A correct statement of the facts in connection with the shooting might or might not have had any effect on his diagnosis. All of the information was obtained from the patient, close relatives, or his attorney. Case history is a relative thing. All information should be included in the whole background. But in no case does a doctor have it all. He said that he examined and interviewed the accused since September 1, 1960, when he appeared before the Staff on the question of whether he had been restored to sanity. He admitted that if a doctor is working on the ward, he can do better overall job, and that Dr. Ritter is still at the institution. He took about an hour and a half or two hours in the examination at the Staff meeting and had perhaps seen him an hour before that. He had not seen the accused until he was

brought to the hospital, which was about six weeks after the crime. It would have been more valuable if he could have examined the man immediately after the offense was committed. He finally admitted that, without a case history, it is not possible to make a proper diagnosis of a prior existing mental illness, and that such case history should be accurate. If there are outstanding inaccuracies in the case history, the diagnosis can be incorrect.

On redirect-examination he said that the most important factor in his diagnosis was that the three bullet holes looked like a determined effort on his part to kill himself. Due to the defendant's long, narrow heart, the vital organ was missed. This was convincing evidence that he was sick back then. He said that an effort to commit suicide is the chief evidence of this form of insanity.

On recross-examination, he admitted that drug addicts often attempt suicide and sometimes, when they are getting over the effect of alcoholism. A person using alcohol to excess is more unstable. When asked if a person who had killed his wife and shot his daughter, being remorseful, is more likely to commit suicide than a person who has not, he replied that he could not give any statistical answers on that because he did not see cases of that kind very often.

At this point, the defendant, after the introduction of certain documentary evidence, rested.

In rebuttal, Bennie Ray, City Marshal, testified that he had known the accused seven or eight years and usually saw him two or three times a week, and at least every Saturday, when they would talk about fishing, farming and things in general. He talked to the accused two or three days before June 5th. Based on his conversations, observations, over a long period of time and his acquaintanceship with him, he was of the opinion that, on June 5, 1960, when accused shot his wife, he

knew right from wrong. About a year before June 5, 1960, he saw the accused pick up Mrs. Clera Fowler between the Eupora Clinic and the Baptist Church in Eupora on Fox Avenue; she got in the car and lay down, and he drove off. He had also observed other similar occurrences with the same woman although he did not remember the date.

William Blaylock had known the defendant all of his life. He had a conversation with him about the first of April 1960, about some cottonseed. The defendant told him when he came to get the cottonseed, to bring him a gallon of whiskey. He did so and delivered it then. They both took a drink at the time, and he set the liquor back in the cottonseed. He knew Mrs. Ella Gary. On the 7th or 8th of April 1960, as he was on an errand to arrange for a medical examination, he noticed the defendant's pickup and her car sitting bumper-to-bumper on the side of the road about one and a half miles north of the Gary home. This attracted his attention and he noticed them on the side of the road, lying on a blanket or tarpaulin, engaged in sexual relations. On cross-examination he admitted that he had served a year in the penitentiary for making liquor.

George Adair was Manager of Futorian-Stratford Furniture Company. The accused came to his office one day, told him there was domestic trouble, and asked him to fire his daughter so that she and his wife would go back home.

Shed Bell had known the defendant twenty-two years or longer and had sold him a pickup and two automobiles. During that period of time he would see him every day at times and sometimes once or twice a week. He sold defendant gasoline and nearly every time on those occasions they would talk. He saw the accused on Sunday morning just before the killing and spoke to him at the time. Something like thirty or sixty days before this, the accused asked him to go to Wells-Lamont

Company and talk to his wife and try to get her to
come back home. He did as requested and he and Mr.
Crenshaw talked to Mrs. McGarrh. He was on friendly
relations with defendant. Based upon conversations and
observations of his habits and conduct, he had an opinion
as to his sanity and it was his opinion that the defendant
was, on June 5, 1960, just like he had always been.

Haven Watson lived in the same community and had
known the defendant all of the witness' life. He talked
to defendant on Saturday before the killing at his cotton
patch about poisoning cotton. The conversation lasted
about ten minutes. Customarily he had seen him once
or twice a week for the preceding two years. The man
was a good farmer and he had never noticed anything
peculiar about him. Based on those experiences, he had
an opinion as to his sanity, and in his opinion, the de-
fendant knew right from wrong on the day of the killing.

C. K. Moore was sixty-eight years old, and had known
the defendant all of his life. He once sold him a grocery
store. About eight days before the killing, the defendant
talked to the witness at least thirty minutes in an effort
to enlist his aid to get his wife to come back home. They
also talked again that afternoon. During the two years
prior to the killing, he saw the defendant every week
and had many conversations with him, some of which
were lengthy. When the conversation occurred eight
days before, the defendant apologized for the smell of
liquor on his breath. Based on his acquaintanceship
and what he had related, he had an opinion as to his
knowledge of the difference between right and wrong.
In the witness' opinion, the defendant was sane on
June 5, 1960.

John Frank McCain knew the defendant for thirty-
five years. He spoke to him on Saturday before this
happened on Sunday. Within the past two years he
had had conversations with him from time to time, and
talked with him three to five minutes the Saturday

before. He ginned the defendant's cotton crop which consisted of about twenty or twenty-five bales. He was bookkeeper at the gin. The defendant was as pleasant as any patron for whom he had ginned. They talked to each other and "deviled" each other. They belonged to the same church. From conversations, business transactions and observations prior to June 5, 1960, it was his opinion that the defendant was sane at the time.

Kenneth Middleton had known the defendant six years. He lived three-fourths of a mile from him and saw him pretty often, at least two or three times a month. He had visited in his home and the call had been returned. He saw him on the Sunday morning of the killing. As he was going to church the defendant was driving down the road in front of him. The defendant turned in at Hollis Gary's house — that was the home of Ella Gary. He had also talked to him on Friday before. While working in the field, the defendant came by and they talked about crops. He smelled whiskey on defendant's breath at the time. On the basis of what he had already related, it was his opinion that on June 5, 1960, the defendant could distinguish between right and wrong.

C. P. Fortner was Vice President of the Bank of Eupora, where the defendant had done business for about fifteen or twenty years. He saw the defendant occasionally. The last time was in the afternoon before the killing, at which time they discussed his marital troubles. He talked to the defendant ten or fifteen minutes and did not notice anything peculiar although he seemed to be troubled. Based upon his acquaintenceship, observation and conversation from time to time and that Saturday afternoon, in his opinion the defendant was capable of knowing the difference between right and wrong.

Dr. Willard L. Waldron examined the defendant in his office on October 13, 1961, for the purpose of attempting to diagnose his mental condition on June 5,

1960. The object was to see if this could be determined from the case history and the examination that would be made. He had only the history that was available at the State Hospital and that which was given him by the patient himself. McGarrh preferred not to discuss his domestic troubles because his attorney had instructed him not to do so. On this account, it was very difficult for him to arrive at an opinion. (There was an objection by counsel and the court was requested to instruct the jury as to what the defendant's rights were under the circumstances, and the court promptly conformed to this request.) The doctor was able to have a satisfactory conversation in other areas in regard to his family history, early background, marital experiences, and social and recreational habits, as well as education. But he found nothing in any of those sources to indicate a psychosis preexisting the shooting of his wife. Neither could he find anything in the case history at Whitfield or his examination to reveal that the psychosis preexisted this shooting. The diagnosis by the Staff at Whitfield had been a psychotic depressive reaction. He said that there is usually some very severe stress reaction that brings about this condition; that personal violence to other people is not ordinarily associated with such a reaction; and that suicide is a very likely thing but action against others is unusual. A psychotic depressive reaction can occur in a man who has just killed his wife and shot his daughter at the moment that he recognizes what he has done — the minute that the act is completed, he could then begin the depression and it could progress very rapidly into a serious reaction. He said that a full and complete history is essential. It involves interviewing not merely the patient and one or two people, but statements from others who have been associated with him in other phases. Childhood diseases, religious and social background, and habits are all essential. It would be per-

fectly possible and quite logical for the psychotic depressive reaction to follow the act of killing someone. A man who has been through a lot of difficulty over a period of time might ultimately break, if it was severe, or a threat to his integrity so that he felt that he could not continue to act in relation to reality. If there is no history of flights from reality under particular stress, the odds would be against having one prior to the commission of violence. The doctor was unable to support the Whitfield diagnosis on the basis of what was given in that history as to a preexisting situation. He agreed that McGarrh had a psychotic depressive reaction, but he was unable to tell when the onset began. He illustrated it thusly: A person may be going along nicely and enter a calamity that will destroy him, such as running into a neighbor's child, or, in despondency, destroy oneself on being informed that his family has been wiped out in a disaster. These things bring about a fit of depression, causing him to think there is nothing to live for. If a psychiatrist relies in making his diagnosis upon histories with substantial falsities and inaccuracies, which can affect the diagnosis, it will cause him to render an improper or incorrect opinion. He was asked a hypothetical question substantially to the following effect: Assuming to be true a married man of forty-seven years of age is a successful farmer; that members of his immediate family, close acquaintances, and persons with whom he had business transactions noted nothing about him to indicate any peculiarities of personality; that he had a history as a regular user of alcohol for many years with a nearly daily use for the past two years; that he had been having illicit sexual relations with the wife of a neighbor for some five years; that his wife had learned of this relationship and accused him of it and asked him to quit seeing her; that he became enraged at her and denied the relationship; that, on five different occasions because

of that relationship, she separated from him, but that he was able on each occasion to persuade her to return for short intervals by promising not to see the woman again; that a third separation occurred for the same reason; that the wife then filed suit for divorce; that the wife was living with his daughter and that the man went to his daughter's employer in an attempt to have her discharged but failed; that at 7:30 in the morning two days before the court hearing on the divorce matter, he went to the residence of the wife and tried to persuade her to return and she refused; that at approximately 10:30 on the same morning the man had been drinking whiskey, blocked the road, stopped the car driven by his wife and also occupied by their grown daughter, and ran to the car with a pistol in his hand, at which time the wife cried out, "Don't do it Everett, I'll live with you" and he replied, "No, you won't either", and immediately shot his wife several times causing her instant death, and also shot his daughter twice; that within a matter of a very few minutes, he went a short distance to his home where he shot himself three times in the chest but lived — now assuming all of these facts to be true, in your opinion was the man, when he shot his wife, aware of the consequences of his act and did he know the difference between right and wrong? The witness said, "On those premises I would say that the man was aware and he did at that time know the difference between right and wrong."

On cross-examination, the witness agreed that Dr. Jacquith and Dr. Head were both good psychiatrists and said that he was not in a position to claim that their opinion was wrong; but that he does question the correctness of the diagnosis. It was his opinion that the case history from Whitfield does not support the findings in the case. When he saw the defendant on October 13, 1961, he was then well and mentally normal. He spent about two and a half to three hours in making

the examination of him. He adhered to the principle that the case history is the only method of determining the date of the onset of any case. He has been eligible to take the board to become a board psychiatrist since 1942, but just has not done so. He said that the art of psychiatry is based primarily on getting an accurate, complete and concise history, and seeing the patient, and from those two sources formulate an opinion as to the nature of the illness. He was unable to substantiate the Whitfield findings. On the basis of the information that was available, he does not think that he could have determined whether or not the defendant was psychotic at the moment if he had had that material at hand and had seen him then. He was frank to say that, with such a limited history, he does not think that he could have determined then whether or not the man was sane.

From the foregoing resume of the testimony, it will be seen that the State offered evidence tending to show the following: The defendant succumbed to two of the baser human appetites, namely, philandering and excessive consumption of alcohol. His wife became apprised of his infidelity and tried to get him to quit. He would promise to do so and then renege on his promises. Due to these evil habits, the daughter — the only child of the marriage — left home where she had lived her twenty-nine years, and secured a job in Eupora, eight miles away. The defendant's unfaithfulness to his wife brought about several separations, at which times, she would live with her daughter in the latter's apartment. With the final separation, the wife brought suit for a divorce, support, and all proper relief. The defendant tried to get the daughter's employer to fire her so that she and her mother would return home. He enlisted the good offices of friends in an effort to effect a reconciliation with his wife. Failing in all of these measures, on Sunday morning,

June 5, 1960, before the trial was to be heard the following Tuesday, he went to his daughter's apartment and talked to his wife for nearly two hours in an effort to have her return to him and dismiss her suit, but, without avail, his wife telling him that she was going forward with her suit. Thereafter, as his wife and daughter were driving around and were nearing the country home, the defendant, in his pickup, drove in front of them, blocked the road, got out of his truck, and started toward their car. Mrs. McGarrh, trying to back the car, saw that her husband was armed, and cried out to him, "Don't do it, Everett, I'll live with you." However, he replied, "No, you won't either", and began shooting. The wife was hit, and slumped under the wheel, and the daughter, being hit twice, slid out the door on the opposite side and either squatted or lay down. The defendant, evidently believing that both of the women were dead, started his pickup, drove to the house, and, a few minutes later, shot himself three times in the breast. In other words, according to the State's evidence, the defendant was guilty of a course of conduct which his wife, after repeated broken promises, refused to countenance. The defendant thought that the daughter had given his wife aid and comfort and was also responsible for her refusal to return. He was unsuccessful in his efforts to change her mind through the intervention of others. He made a last determined effort that Sunday morning before the case was to be tried on Tuesday. But again he failed. Consequently, he made up his mind that, if he could not stop it one way, he would stop it another. He saw the two women driving along the road, he determined that this was the time and place when he would see to it that it was stopped. As a result, he got into his pickup, drove in front of them, blocked the road, and, although his wife tried to dissuade him by promising that she would live with him, he shot her to death, at the same

time almost mortally wounding the daughter also. On the face of the record, the evidence is strong that there was present at the time every element of malice. For instance, there was a loss of pride flowing from defeat by reason of his failure to have his will in this marital disturbance, followed by spite, ill will and an evil intent to wreak vengeance upon those who had so discommoded, defeated and angered him. Obviously, there was no element of self-defense. Neither could it, by rhyme or reason, be denominated excusable, nor, in view of the meditation and deliberation, did it have any of the earmarks of sudden provocation. The grade of homicide was clearly murder.

But the defense was insanity at the time of the commission of the offense. That theory was based on the finding of the Staff at Whitfield and the testimony of Drs. Jacquith and Head. However, it must be kept in mind that the defendant was not sent to Whitfield until six weeks after the killing, and that the history of the case, upon which the doctors relied, was given by the defendant, his mother and his attorney. In that history, the defendant was represented as practically without fault so far as the marital upset was concerned. Under this version, actually, the wife was the one, who nagged him all of the time and did not want him to be friendly with the neighbors. Besides, he had never drunk a half-gallon of liquor in his whole life, and had never even once "stepped out" on his wife. Dr. Jacquith was of the opinion that, even though the history was inaccurate, they had sufficient history, with observation, to make such diagnosis. Dr. Head admitted, on cross-examination, that it would have been very valuable if he could have examined the defendant shortly after the commission of the offense. He also admitted that it was not possible to make a proper diagnosis of a prior existing mental illness without an accurate history, and that, if there were outstanding inaccuracies in the case

history which he used in making this diagnosis, his diagnosis could be incorrect. This doctor said that the chief factor in his diagnosis was the attempted suicide when the defendant shot himself three times in the breast.

The State met the issue of insanity with substantial evidence, which tended to show that (1) the case history was incorrect because the defendant had been using alcohol excessively for about two years and the defendant was a philanderer and these two vices were the underlying causes of the marital disturbance, and (2) from nonexpert but competent lay evidence by those who had known the defendant all of his life and for shorter periods, who had seen and talked to him the day before the homicide, the day of the homicide, before and after, and who had observed him frequently thereafter until his delivery to Whitfield. Besides, Dr. Willard L. Waldron, a competent psychiatrist, was of the opinion that the case history was so incomplete that he would not have been able to give a reliable diagnosis, if he had seen the defendant at the time the authorities got him at Whitfield, and he does not see how anybody else could do so. He emphasized that a full and complete history is necessary to determine the onset of the attack. He was asked a hypothetical question, which embraced substantially all of the facts, as shown by the State's evidence, and, upon the assumption that they were true, he was of the opinion that the defendant was able to distinguish the difference between right and wrong at the time of the shooting. The doctor explained that a psychotic depressive reaction can occur in a man who has just killed his wife and shot his daughter, that is, following the completion of the act, and that it can progress rapidly into a serious reaction.

 █ At the outset of his argument, appellant cites Shipp v. State, 215 Miss. 541, 61 So. 2d 329, Rogers v. State, 222 Miss. 690, 76 So. 2d 831 and Musselwhite v. State, 215 Miss. 363, 60 So. 2d 807, and relies strongly

on them. However, they are not as much in point as they might appear at first blush. In the Shipp case, this Court held that the trial court, instead of acting on his own observation of the defendant in the court-room, should have accepted the showing of the fifteen members of the Whitfield Staff that the accused was a schizophrenic and should have conducted a sanity trial as to present insanity. In the Rogers case, supra, there was no issue on the case history. Besides, the evidence of Drs. Head and Jacquith in that case was clear-cut as compared to vacillation and admitted lack of knowledge on the part of the lay witnesses, introduced by the defendant, when the court said that the doctors were in position to give more reliable information than lay witnesses. In the Musselwhite case, the State could offer no evidence whatever of sanity at the time of the hearing by the Supreme Court. These cases in no way signify that the sole arbiter on the question of mental responsibility for crime is to be irrevocably vested in the medical authorities at Whitfield.

This Court, in Wood v. State, 58 Miss. 741, in arriving at the rule with reference to the admission of nonexperts on the question of sanity or insanity, said: "How much weight is to be given to the opinion of a witness on the question of insanity depends, like the weight to be given to all other opinions, upon the intelligence of the witness and his opportunities of observation; and while the testimony of a professional man, with equal opportunities, would ordinarily be more reliable than that of a nonprofessional, the testimony of an intelligent friend who had known the subject of the inquiry for years, might be more weighty than that of the most experienced expert who had seen him only since the condition of his intellect had become a matter of investigation. Craft and deceit might mislead the one into an error which the lifetime acquaintance and observation of the other would readily detect."

Now, if a friend can be such a valuable witness, it is obvious that the testimony of an only daughter, who had lived all of her twenty-nine years in the home and doubtless knew more about her father than any other person except her mother, might be more weighty than that of experts who saw him weeks later. And the defendant drew out of her on cross-examination the statement that her father had never been crazy, and had her elaborate on her father's conjugal infidelity.

Manifestly, if the defendant, when he finished firing into his wife and daughter, had then turned the pistol on himself and there, on the scene, had inflicted the three wounds in his breast, the theory of insanity, at the time, would have been very plausible. But he did not do that. The jury was warranted in believing that, after he had shot his wife and daughter, he then started his car and drove some distance to his home; that several minutes elapsed; that he came face to face with the enormity of his crime, stemming from ill will and malice in having shot and killed, as he thought, two defenseless women, one his wife and the other his daughter; that he could see himself, as it were, sitting in the gas chamber as retribution for this crime; and that, under such circumstances, he came to the conclusion as a result of remorse for his act, that he would end the whole thing then and there. Consequently, he knew right from wrong when he killed his wife and shot his daughter. If insanity occurred, it resulted subsequent to the commission of his crime; and when he was restored to sanity, he should be held accountable for his act.

I.

██ █ Whether the defendant knew the difference between right and wrong at the time of killing his wife was a disputed issue of fact and was, therefore, properly submitted to the jury. Consequently there was no error in refusing the defendant's requested peremptory instruction to find him not guilty.

## II.

The evidence was substantial and ample to sustain the verdict of the jury. Consequently, there was no error on the part of the trial court in overruling the motion for a new trial on the ground that the verdict was contrary to the great weight of the evidence.

## III.

 Actually the objection here went only to the defendant's illicit sexual relations. The evidence of the daughter, with other corroborating statements of witnesses, justified the assumption in the hypothetical question to Dr. Waldron that the defendant had been drinking heavily for about two years. While the record does not justify an assumption that the defendant's philandering had existed for five years, it was sufficient to show that such conduct had continued for a substantial period of time prior to the killing. Several reconciliations had been effected by reason of the defendant's promises that he would ''quit his doings.'' The logical inference would be that his unfaithfulness had been habitual. The difference between five years and habitual could not be deemed prejudicial under the circumstances. 32 C. J. S., Evidence, Sec. 551 (4), p. 357. The material facts, favorable to the defendant, which were said to have been omitted, were not pointed out as a basis of objection on the trial; and of course the objection cannot be enlarged here. State v. Goering, 200 Miss. 585, 28 So. 2d 248, and cases there cited. This is not such a case as Kearney v. The State, 68 Miss. 233, 8 So. 292, where the supposed facts were imaginary and the hypotheses, except what occurred at the time and place of the killing, were wholly unsupported by any evidence. The rule being that, where the defense is insanity, the door is open, and that considerable latitude should be allowed in the examination of witnesses to show any abnormality of mental condition at the time of the crime,

Cunningham v. State, Smith v. State, and Waycaster v. State, supra, conversely, the same mode of procedure is available to the State to offer evidence as to no abnormality. These erroneous assumptions did not constitute reversible error.

## IV.

 ██ ██ Drs. Jacquith and Head started out, in their testimony, with the proposition that the basic factors by which the onset of insanity was determined were the case history and their observations and clinical findings. Dr. Head finally conceded that an accurate case history is necessary, and that, if it was inaccurate, the diagnosis could be inaccurate. The Whitfield authorities had obtained a history. Manifestly, before that diagnosis could be weakened, if at all, it was necessary to show the truth about it, and that it was not correct. If they had had the benefit of a correct history, namely, that he was drinking heavily and had been philandering, they would have been able to discover the underlying cause of the marital disruption and understand that the defendant rather than his wife was blameable, and thus preceive the reason for the defendant's ill will and animosity against his wife and daughter and account for a motive on his part to get them out of his life. True, Dr. Jacquith was of the opinion that the history was not pertinent. But Dr. Head admitted that, where the history is incorrect, the diagnosis can be incorrect. The history was undoubtedly material and the evidence was admissible. When it is kept in mind that, under the defense here invoked, every act of the accused is relevant to the issue and admissible in evidence, it is obvious that rebuttal evidence concerning the defendant's drinking and marital unfaithfulness was material. Besides, the question of sanity and guilty intent were too closely tied together to permit a separation, or exclusion of one from the other. Clanton v. State, 242

Miss. 734, 137 So. 2d 180, and authorities there cited. In addition, the rules as to the order of proof are to be enforced or relaxed by the court in the furtherance of justice. 88 C.J.S., Trial, Sec. 96, p. 206.

## V.

■■ In connection with the charge of prejudice because Dr. Waldron said that his area of inquiry was limited for the reason that the defendant, at the time of the examination, invoked his constitutional right not to discuss his troubles, the defendant has cited a number of cases which involved attempts to acquire testimony in court or by a violation of constitutional rights against self-incrimination. As heretofore stated, when objection was made by the defendant, it was promptly sustained and the jury was immediately instructed fully as to the defendant's rights. In the case of Long v. State, 163 Miss. 535, 141 So. 591, the sheriff was permitted to testify that Long told him on the morning of the killing that he would rather not talk about the matter then as he was too drunk. It was argued by the defendant in that case that his objection should have been sustained because the admission of this evidence was equivalent to forcing him to testify against himself. The Court said that there was no reversible error in this incident. If the defendant in the present case believed that this occurrence in the presence of the jury had prejudiced his cause, he should have taken advantage of it by a motion for a mistrial. However, he did not do this — he did not make a motion for a mistrial. In Blackwell v. State, 44 So. 2d 409 (Miss.), the Court stated the rule to be as follows: ''It is now well settled that when anything transpires during the trial that would tend to prejudice the rights of defendant, he cannot wait and take his chances with the jury on a favorable verdict and then obtain a reversal of the cause in this Court because of such error, but he must ask the trial

court for a mistrial upon the happening of such occurrence when the same is of such nature as would entitle him to a mistrial. Such a motion was not made in the instant case, and since the trial judge did all that he was asked to do at the time of the occurrence, the error complained of does not entitle the defendant to have the case reversed.''

The record further discloses that defendant moved the court for a mistrial, stating therein that, theretofore when Dr. Waldron had testified concerning defendant's refusal to answer questions concerning the crime, the court had instructed the jury that he was within his constitutional rights and they could not hold that against him; that the special prosecutor, without giving exact language, ''has reargued that'' to the jury; that defendant's objection had been made and sustained; but that the harm had been done. For that reason, a mistrial was sought. The record shows an oral charge to the jury, directing the members not to draw any unfavorable inference of any kind against the defendant on account of any refusal to answer questions of the psychiatrist. Under Long v. State, supra, the statement by the doctor did not amount to reversible error. At any rate, the defendant did not regard it as reversible when the doctor related it, as no motion for a mistrial was made. Obviously, if it was not reversible when the doctor was testifying, it could hardly have developed into such from the statement of one of the lawyers later.

## VI.

The sixth assignment has to do with the mode and manner of the introduction of the evidence for the State. It is obvious from this record that all of the evidence complained about was in fact competent. The only question is whether or not, at the time of its introduction, it was offered in accordance with the usual mode of trial. In 88 C. J. S., Trial, Sec. 96,

p. 206, it is said: ''The general rules of practice with respect to the order of proof must be enforced or relaxed by the court in furtherance of justice, and are not to be applied with such technical precision and unbending rigor as to produce injustice * * *''.

At the time of the trial, the defendant had been restored to sanity. Such evidence as the daughter gave, on her direct examination, about her father's drinking and philandering were undoubtedly for the purpose of showing a basic motive for the killing. The cross-examination developed her opinion that her father had never been crazy, and fuel was added to the flame of marital infidelity. Presumably that is when the representatives of the State decided that it would be necessary to counter a possible inference of insanity, and, to that end, they did elicit from the sheriff, after proper qualification, his opinion that the defendant was sane at the time of the killing. The marshal of the town, in his appearance, did not express an opinion as to the sanity of the defendant. Although the court had declined to let a full disclosure be made of the past history of the case in connection with the defendant's insanity, when the defendant put Dr. Jacquith on the stand, the full effect thereof came to light and the real issue came into focus. It is not necessary for the Court to say whether, under the circumstances of the case, this constituted error. The only thing that is necessary is to say whether or not, if it amounted to error, such error was prejudicial. The Court is of the opinion that the evidence was both competent and material, and a mere relaxation of the rule as to the time of introduction did not result in any prejudice to the defendant.

From what has been said, it is apparent that no response is necessary to be made to the seventh assignment.

▪▪ ▪ Under Waycaster v. State supra, and like authorities, the court should be very liberal in allowing

the introduction of any and all evidence, which tends to show the sanity or insanity of the accused. For that reason, the Court does not understand why the trial judge refused to allow the adjudication by the jury of the defendant's then present insanity in December 1960. In spite of this ruling, thereafter evidence went into the record which made it obvious to the jury that the defendant was first sent to Whitfield on order of the circuit judge; that, on September 1, 1960, thereafter, it was the opinion of the authorities at the institution that he was insane both then and at the time of the homicide; that subsequently he was returned to Webster County for a hearing in the circuit court on present insanity; that he was then returned to Whitfield; and that he was subsequently restored to sanity. Consequently no harm could have resulted even though there was error in the first instance.

It is rare indeed that a defendant, charged with a serious criminal offense, has the good fortune to be so ably defended as was the defendant in this case. Every possible right of the defendant was zealously guarded by able, learned and astute counsel at every stage of the case. There was no let-up at any time. The earnestness, logic, persuasion and advocacy in his behalf could not be excelled. But for the fact that the case was also prosecuted with great ability by the representatives for the State, there would have doubtless been a number of grave errors. In such a hotly contested case, it would scarcely be expected that mere human beings could keep the record utterly free from error. A thorough consideration of the whole record leads inescapably to the conclusion that the issue of sanity, that is, the ability to distinguish the difference between right and wrong at the time of the killing, was properly submitted to the jury, and that no reversible error appears in the record. What has been said with reference to the trial attorneys is also repeated here in

respect to the briefs, which have been filed by respective counsel and the oral arguments made by them in this Court.

The judgment of the trial court is therefore affirmed.

Affirmed.

*Kyle, Gillespie, McElroy and Jones, JJ.,* concur.