542 So.2d 250 (1989)
Roosevelt WHITE
v.
STATE of Mississippi.
No. 58314.
Supreme Court of Mississippi.
March 29, 1989.
*251 Clarence R. Scales, Scales & Scales, Percy Stanfield, Jr., Stanfield, Carmody & Coxwell, Jackson, for appellant.
Mike Moore, Atty. Gen. by Billy L. Gore, Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
HAWKINS, Presiding Justice, for the Court:
Roosevelt White appeals to this Court following his conviction in the 1st Judicial District of Hinds County of the murder of Ida Lee Schwartz and sentence to life imprisonment. He argues the verdict of the jury was against the overwhelming weight of the evidence on the issue of insanity at the time of the offense, and that he was denied a fair trial due to the admission of inflammatory and prejudicial evidence. Finding no error warranting reversal, we affirm.

FACTS
In 1985 White worked for Schwartz Realty Company in Jackson, Mississippi, which was owned and operated by Seymour and Ida Lee Schwartz. White worked as a superintendent overseeing the maintenance of approximately 200 dwellings which the Schwartzes leased. In connection with his job, White wore a pager which enabled him to be contacted at any time by the Schwartzes. On the morning of December 3, 1985, White entered the realty offices and asked to speak to Ida Lee Schwartz. Upon being told Schwartz was not then in but was soon expected, White asked to be notified when she arrived. When White was notified on his pager by Schwartz of her arrival, he returned to the realty office, asked Schwartz to step into a back office with him, shot her three times in the face and neck with an RG .22 caliber pistol and walked to a nearby police station where he turned himself in.
On December 18, 1985, White was admitted to the state mental hospital for evaluation to determine whether he was competent to stand trial and/or M'Naghten insane. He remained at the hospital until January 24, 1986. Two experts, Dr. Margie Lancaster, a neurologist and director of the forensic unit at the state hospital, and Dr. Helen Robertson, a clinical psychologist, examined White and performed several psychological tests to determine his competency and sanity. Dr. Robertson and Dr. Lancaster each testified at trial that although tests revealed White was suffering from a personality disorder and severe depression, there was no evidence he was M'Naghten insane at the time of the offense. Additionally, Dr. Lancaster testified that on December 18, 1985, White told her of being uptight and worried about personal problems the night before the shooting and he was able to relax once he realized the solution would be to kill Schwartz, and further that this thought re-occurred to him when he was paged by Schwartz on the morning of December 3, 1985.
For the defense Dr. Charlton S. Stanley, a forensic psychologist, and Dr. Donald Guild, a psychiatrist, who both examined White approximately ten months after the offense in September and October of 1986, and who performed a battery of tests to determine if White was insane, testified it was their opinion that on December 3, 1985, White was M'Naghten insane.
These tests performed by Dr. Stanley and Dr. Guild on White, in large part the same ones performed by Dr. Lancaster and Dr. Robertson, included the Weschler Adult Intelligence Scale, which showed White's I.Q. to be 84; the Rorschach Ink Blot Test, which showed White lacked the ability to think in the abstract; and the Bender Visual Motor Test and Luria Nebraska Neuropsychological Test, which *252 each indicated organic brain damage. Further, it was Dr. Stanley's opinion that White in fact suffered from organic brain damage which was caused either by Alzheimer's disease or strokelets, a series of minor strokes which affected the brain, with strokelets being the more likely explanation. However, in rebuttal Dr. Lancaster stated it was her opinion White did not suffer from an organic brain damage caused by either Alzheimer's disease or strokelets, medical conditions which fell within her specialty of neurology.
At trial White's defense was that he was M'Naghten insane at the time of the shooting and, consequently, was not guilty of murder under the laws of Mississippi. The jury, however, found White guilty of murder, and sentenced him to life imprisonment.

LAW

I. WAS THE VERDICT OF THE JURY AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE ON THE ISSUE OF WHITE'S SANITY AT THE TIME OF THE CRIME AND EVIDENCE BIAS, PASSION AND PREJUDICE?
In Mississippi to establish the defense of insanity, it must be clearly proved that at the time of committing the act the party accused was laboring under such defect of reason from disease of mind as to not know the nature and quality of the act he was doing or, if he did know it, that he did not know it was wrong. See, United States v. McCracken, 488 F.2d 406 (5th Cir.1974); Edwards v. State, 441 So.2d 84 (Miss. 1983); Palmer v. State, 427 So.2d 111 (Miss. 1983). Stated more succinctly, the test for insanity is whether the defendant was unable to distinguish right from wrong at the time the act was committed. See, Porter v. State, 492 So.2d 970 (Miss. 1986); Frost v. State, 453 So.2d 695 (Miss. 1984); Moore v. State, 237 So.2d 844 (Miss. 1970); Harvey v. State, 207 So.2d 108 (Miss. 1968). There is a presumption that an accused is sane and, therefore, the burden is initially on the accused to introduce evidence creating a reasonable doubt as to his sanity at the time of the act. However, once the accused has overcome this initial burden, it is the burden of the State to present sufficient evidence to prove the accused's sanity beyond a reasonable doubt. See, Edwards, supra; Billiot v. State, 454 So.2d 445 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369 (1985), reh. den., 470 U.S. 1089, 105 S.Ct. 1858, 85 L.Ed.2d 154 (1985); Myrick v. State, 290 So.2d 259 (Miss. 1974); Herron v. State, 287 So.2d 759 (Miss. 1974), cert. denied, 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974); McGarrh v. State, 249 Miss. 247, 148 So.2d 494 (1963), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); MCA § 99-13-7 (1972).
The issue of insanity is for the jury to determine and such determination must be upheld on appeal unless against the overwhelming weight of the evidence. See, Yarbrough v. State, 528 So.2d 1130 (Miss. 1988); Hunter v. State, 489 So.2d 1086 (Miss. 1986); Gill v. State, 488 So.2d 801 (Miss. 1986); Gerlach v. State, 466 So.2d 75 (Miss. 1985); Brady v. State, 425 So.2d 1347 (Miss. 1983). Furthermore, juries are not bound by an expert's testimony and may accept or reject it in whole or in part. See, Brady, supra; Matthews v. State, 394 So.2d 304 (Miss. 1981).
Consequently, there being ample evidence from which a jury could have determined White was not M'Naghten insane at the time of the offense, but instead understood the consequences of his actions, the verdict of the jury must be upheld.

II. WAS WHITE DENIED A FAIR AND IMPARTIAL TRIAL DUE TO IRRELEVANT, INFLAMMATORY AND PREJUDICIAL EVIDENCE FROM INTERJECTION BY THE STATE OF EXTRANEOUS AND PREJUDICIAL MATTERS?
White argues the State erroneously placed before the jury testimony that he may have been "stealing" from his employers in order to infer a motive for the shooting and to rebut this defense of insanity. He complains specifically of the following *253 which occurred at trial during the cross-examination of Dr. Guild:
Q. Do you find one of the reasons that you decided this close question that he just didn't have a motive for killing her?
A. That's one factor that certainly goes in. That's one of the things you look at. If somebody's got a clear motive for something then you're much more suspicious that it's just a deliberate, pre-meditated act for obvious reasons.
Q. And one way to do that would be to look at the history of whether or not he's taking money, a great deal of money from the company for expenses. Is that right?
MR. STANFIELD:
Your Honor, if the Court please, we object.
THE COURT:
Members of the jury, step into the jury room for a minute.
MR. PETERS:
We're going to prove this. We have the person subpoenaed.
(THE JURY WAS EXCUSED FROM THE COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE PRESENCE AND HEARING OF THE JURY:)
MR. PETERS:
We intend to prove this, Your Honor, and we have advised the Defense Attorneys of that.
MR. STANFIELD:
No, Your Honor, he has not advised us and if he's going to prove it, he ought to have put it on in his case in chief. He's trying to sit back and sandbag us by coming in and re-opening his case under the guise of rebuttal to put on something that he didn't put on in his case in chief and to try to set the predicate by asking Dr. Guild these questions that Dr. Guild knows nothing about so he can deny them to give him that right. We would object to any testimony elicited along this line.
THE COURT:
Let me hear the question first. Ask the question.
MR. PETERS:
Q: Would the fact that he's been taking a great deal of money from the company in the form of expenses, almost equal to his salary, influence you at all?
A: It would influence me. Anything you tell me would influence me. In this case I know there's  well, let me tell you what I know. He was under an unusual working relationship. He never took a vacation. He didn't leave work. He never took a vacation. They had discussed it several times back and forth and from what I can see of the situation the understanding was that he would be allowed to do some part-time jobs on his own since he didn't take a vacation. He could just take that time off and do some moonlighting work. That was one of the areas that led to controversy between them. Now, he was angry because they disputed some of the reimbursement that he had to the men. He felt that he had paid out of pocket expenses to some of the men because they were just common workmen and they want their money right then and there so they can go and do whatever they want to do with their money and he would pay them and felt that the Schwartzes would not reimburse him for that. That's one of the problems there.
So there were some areas there but still, if you read what Mr. Schwartz says, if you listen to what they all say, there was never an open disagreement between any of them that I can find.
MR. PETERS:
That's exactly what I'm getting to, Your Honor. There was a legitimate dispute over expenses that he was having with them. There's no way we can prove it. The lady is dead, but a reasonable inference would be that he got mad with her for doing that. And I have told the defense attorney, even though he denies it, I have told him do you realize he was getting expenses equal to his salary, and the doctor himself knows it. I think I discussed it with Dr. Guild.
*254 THE COURT:
The objection will be overruled. [Emphasis added]
White argues the trial court erroneously allowed this information that he was allegedly taking exorbitant amounts of expense money to go before the jury because it was never proved by the State he took any money. Instead, following the overruling of the defendant's objection, the jury only heard the district attorney ask Dr. Guild if his opinion that White was M'Naghten insane would change if he knew that White was taking money and that Mrs. Schwartz was the bookkeeper. While this questioning was not appropriate without supporting proof by the State, any error to White was cured by the following limiting instruction:
INSTRUCTION 1
It is your duty to determine the facts and to determine them from the evidence produced in open Court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork, or conjecture... . Arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark. [Emphasis added]
Therefore, it being a presumption that jurors follow instructions presented to them, any error was harmless.

III. WAS WHITE DENIED A FAIR AND IMPARTIAL TRIAL DUE TO IRRELEVANT, INFLAMMATORY AND PREJUDICIAL EVIDENCE BY THE DISTRICT ATTORNEY ERRONEOUSLY TELLING THE JURY OF WHITE'S STAY AT WHITFIELD.
White argues that the following questions propounded by the District Attorney during the cross-examination of Dr. Guild were improper and prejudiced him:
Q: So at that time then you felt, "I very well may take the stand and say he's not M'Naghten insane," is that right?
A: It was possible at that time that I would take the stand and say he was not M'Naghten insane.
Q: That was two months ago that you had that opinion?
A: That's correct.
Q: Now, tell me what it is that's changed your mind other than, oh, just the whole file. Tell us something concrete.
A: I think looking at probably the State Hospital transcript of his first stay and re-reading that is very important. His credibility; you know, at first you look at one of these people  he's being charged with murder. He's going to go to jail for a long time if he gets convicted. If he gets sent to the State Hospital, well, it may not be super but it's a lot better than Parchman.
Q: For how long?
A: Well, as long as you're there unless they improve Parchman and Whitfield goes downhill.
Q: No, for how long do you think he anticipates staying there?
A: Where?
Q: At the Mississippi State Hospital.
A: I never have asked him that. I don't know.

* * * * * *
MR. STANFIELD:
If the Court please, may we be heard?
THE COURT:
Members of the jury, step into the jury room, please.
(THE JURY WAS THUS EXCUSED FROM THE COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY:)
MR. STANFIELD:
Your Honor, we object to Mr. Peters trying to go into the length of stay that Mr. White might receive treatment at the State Hospital. That's not up to the Court, Mr. Peters, or anybody else. It's up to the director of the State Hospital out there as *255 to how long he might stay. He's trying to get into the fact that the State Hospital out there has a long history of turning people loose with psychotic or paranoid personalities that go out and commit other crimes. Therefore we say that's another reason why the staff at the State Hospital has a conflict of interest in coming in and testifying as to the issue of sanity or insanity to start with; because they don't want them out there. They turn them loose when they get out there. He's trying to get into this issue and we say that it's inadmissible and is strictly to prejudice the rights of this Defendant.
MR. PETERS:
I'm not the one who brought this up, Your Honor. They're the ones that brought it up. They're the ones that asked should he go to Whitfield. They're the ones that had Dr. Guild say some people have a reason to tell a lie as opposed to telling the truth to go to Whitfield instead of going to Parchman. [This was not actually said or in the record.] Dr. Guild just finished saying it would be better for him to go to Whitfield than to go to Parchman and that could be a motive for him doing what he's doing. They're the ones that opened this entire area up, Your Honor; not me. But because they opened it up, I have every right to go into it.
THE COURT:
Do you to respond to that, Mr. Stanfield?
MR. STANFIELD:
Yes, Your Honor. The only thing that this jury can do is if they find that he has not been restored to reason but that he is M'Naghten insane is to have him sent back to the State Hospital. Now, how long he stays there is of no concern to the jury or to this lawyer or to the District Attorney, or to the Court. It's up to the director of the State Hospital who has exclusive jurisdiction to keep him as long as he needs to, forever and a day if necessary, or to let him go in three days. That's not even relevant, Your Honor, and probative to this jury and it's prejudicial and we object to it.
THE COURT:
Why did you go beyond the point of whether he's insane, he's been restored to reason, and so forth, and you go into with Dr. Stanley and Dr. Build as to what the treatment should be?
MR. STANFIELD:
Your Honor, the man needs additional treatment and these are qualified psychologists and psychiatrists and can express what treatment 
THE COURT:
But why did you bring that up to the jury? That's what I'm asking you.
MR. STANFIELD:
To let the jury know that he man needs treatment. They've go to make a decision, Your Honor, as to whether he's been restored to reason or not and that's a jury question.
THE COURT:
But as to the possible treatment, that has nothing to do with whether he's been restored to reason. And as to the length of time  you asked of the type of treatment from Dr. Stanley and Dr. Guild. You asked Dr. Guild his opinion of where he should be treated  in a nursing home.
MR. STANFIELD:
Your Honor, how in the name of heaven can the fact that the man needs additional treatment have anything to do with how long Whitfield may or may not keep him? Dr. Guild has no earthly idea of how long they're going to keep him out there because he's not out there.
THE COURT:
Well, why then did you inject it then?
MR. STANFIELD:
Judge, I injected it because it was probative for the jury to determine the basis of this man needing additional care because he is dangerous to himself and to society.
THE COURT:
Well, I think you opened the field ... . you man go into the field of length of confinement if you feel it's necessary. [Emphasis added]

* * * * * *
(THE JURY RETURNED TO THE COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD IN THE PRESENCE AND HEARING OF THE JURY:)

* * * * * *
*256 Q: Mr. Stanfield has put you on the stand and said that what should be considered is that this man should go to the Mississippi State Hospital. Is that correct?
A. That's correct.
Q: How long can he reasonably expect to stay there if he's sent there by this Court?
A: He can expect to stay there as long as the doctors felt that it's necessary for him to stay there. Until he is either restored to reason or until he gets to such point as he's not dangerous.
Q: Well, you've seen where they've said that he's restored to reason and not dangerous, haven't you?
A: No, I didn't see that anywhere in there.
Q: Have you seen that he's been found not M'Naghten insane and recommended that he stand trial and be criminally responsible?
A: Well, see, there's the trouble with law and medicine. You actually can be, for the layman pretty crazy and still be able to stand trial. We've brought patients out of Whitfield and had them go to trial and we've taken them back and kept them 25 years. Your legal standards and your medical standards just don't match at all. Now, I'll be happy to go through each one with you where the law decides on one thing and the doctors decide on another. You can have a man that's able to stand trial and either responsible or not responsible for his crime and he can still wind up spending a long time at the State Hospital.
Q: Or?
A: Or he can stay a day.
Q: Thank you. Then what would happen to him?
A: Well, you know, that's a big question.
Q: What does Whitfield do with him?
A: Pardon?
Q: What does Whitfield do with him?
A: Well, it depends on what program you're in. They can send you to a nursing home. Okay, there's 
Q: Or?
A: Well, let me finish. I want to explain thoroughly. They can take a patient in and see them immediately and transfer them to a nursing home. They can take them in immediately and transfer them to a medical-surgical hospital where medical conditions are treated and there certainly are medical conditions that mimic mental illness. Or they can take them and put them on a receiving unit or the forensic unit, criminal unit, and keep them there. Then at that point after they have treated them and after they've evaluated them, they can send them out to a cottage on the grounds or they can send them to the progressively less secure wards on the maximum security unit. They can send them to the extended forensic unit or the on-the-grounds unit and from there they can go home to their family, they can go to a community personal care home. If they're a veteran, they can go to the VA. Some of them  if they show a capacity to be able to do it, some of them are released on their own. That is very rare. I would point out that I've not seen anybody come in and stay just a day but you asked me what's possible.
Q: You gave us an example of your seeing a guy come out there and stay for 25 years after the Court sent him there. Do you know who I'm talking about when I say Buckethead?
A: Yes.
Q: How crazy did you say he was?
A: He 
MR. STANFIELD:
Your Honor, we would object unless this has something to do with Mr. White.
THE COURT:
Sustained.
Q: Dr. Guild, are you saying then that it's not your opinion, based upon your stay at Mississippi State Hospital, that if you can give a person enough drugs to where he's stable you don't just turn him loose.
MR. STANFIELD:
Your Honor, we object unless it pertains to Mr. White.
THE COURT:
Overruled.
*257 A: The State Hospital has had numerous difficulties. Some of those difficulties are financial. Some of those difficulties are lawsuits. Civil and criminal commitments are judged by different standards. If you come in on a civil commitment by a Chancery Court, you are released at the soonest possible date. In other words, if you go to the Chancery Court because you start acting like a duck and nesting in the corner of your room and they send you out to Whitfield, as soon as you are thought to be not dangerous to yourself or anybody else, you have to be immediately released. Now, when you are sent in on a criminal commitment by a Circuit Court jury the standard is more stringent. Now, it has not always been followed in the past.
Q: Which means if you get enough drugs in them and they're not dangerous to themselves or society, you turn them loose.
A: Well, that's been the case in the past.
Q: Thank you... .
(T-III. 609-619)
The State argues the reference by the district attorney to White's possible stay in Whitfield if found insane was invited by the following question from the defense counsel during the direct examination of Dr. Stanley and Dr. Guild:
Q: What recommendations, if any, would you make toward future treatment care for Mr. White?
A: (BY DR. STANLEY):
[M]y best recommendation for a person beginning to have dementia, senile dementia, is the same advice I give to families when grandpa beings to weird out and that is a nursing home where they know  a skilled nursing home, I might add  where they know how to deal with people like that. The alternative would be the State Hospital.
Q: What recommendations, if any, would you make toward future treatment and care for Mr. White?
A: (BY DR. GUILD):
Well, I think he should be hospitalized and confined and I would recommend going ahead and treating him with some anti-depressants and certainly watching him closely. Hospitalization with his problems would be the major part of it. I think he should be confined for a period... .
References to a defendant's potential length of stay at a state hospital have been generally held improper. See, Smith v. State, 220 So.2d 313 (Miss. 1969). However, it has also been held a defendant cannot complain of that which he invited. See, Edwards, supra; Jefferson v. State, 386 So.2d 200 (Miss. 1980); Simpson v. State, 366 So.2d 1085 (Miss. 1975); Sanders v. State, 219 So.2d 913 (Miss. 1963). In the present case, the defense counsel asked both defense experts what treatment they believed White needed, and both responded they believed the State hospital would be appropriate for White. Then, during cross-examination, Dr. Guild once again stated it was his belief White should be placed in the State hospital, which he believed would be a much better place for White than Parchman. It was these statements by Dr. Guild and Dr. Stanley which prompted the district attorney's questions regarding the explanation of expected treatment at the state hospital. Moreover, they were not serious enough to require reversal. The jury obviously knew that if they found White not guilty because of insanity, he would be treated, not punished.

IV. WAS WHITE DENIED A FAIR AND IMPARTIAL TRIAL DUE TO IRRELEVANT, INFLAMMATORY AND PREJUDICIAL EVIDENCE BY THE DISTRICT ATTORNEY SHOWING A PRIOR CONVICTION NOT AUTHORIZED UNDER THE MISSISSIPPI RULES OF EVIDENCE?
Lastly, White argues he was prejudiced when the district attorney brought out evidence of a prior assault with intent to commit rape conviction in 1958. He argues specifically that this evidence is barred under Mississippi Rules of Evidence (MRE) 403 as not probative as well as under MRE 609(b) because the conviction was over ten years old. At trial and out of the jury's presence, the trial judge found that MRE 609(b) was inapplicable because this information was not being used for impeachment purposes, but found under MRE 403 the probativeness of this information outweighed any possible prejudice, and *258 consequently ruled to admit the evidence. Prior to the court's ruling allowing this evidence in, Dr. Stanley stated in front of the jury he did not believe the information of a prior violent crime would be particularly useful in evaluating a person for M'Naghten insanity. However, subsequent to the trial court's ruling and also in front of the jury, Dr. Stanley stated he had used this information in his evaluation and had been very interested in White's 1958 conviction of assault with intent to commit rape and subsequent ruling in 1960 by Whitfield that White was sane, and furthermore had only discarded this information after his determination that White was M'Naghten insane. He further acknowledged he would have been interested in and would have carefully considered any violent offense White may have had in evaluating for insanity. Therefore, in light of Dr. Stanley's admissions and because the past acts of a defendant who pleads insanity are always relevant, we find no error in the admission of this evidence. See, Johnson v. State, 475 So.2d 1136 (Miss. 1985); Taylor v. State, 452 So.2d 441 (Miss. 1984). The judgment is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
DAN M. LEE, P.J., and PITTMAN, J., not participating.