GAMBRELL *v.* STATE.

No. 41543 May 30, 1960 120 So. 2d 758

*Earle L. Wingo, E. J. Currie, Sr. & Jr.,* Hattiesburg; *Carey Bufkin, Hubert S. Lipscomb,* Jackson, for appellant.

894

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

GILLESPIE, J.

Thomas B. Gambrell, an attorney about 31 years of age, was indicted for the murder of Mississippi Highway Patrolman H. L. Duckworth, a kinsman and friend of appellant. The trial resulted in conviction and the death penalty.

Appellant was employed in the early part of 1959 as a field representative by John Gregg, campaign manager for Ross Barnett, candidate for Governor. He had been assigned to the Hattiesburg area in the second primary. Duckworth was killed between midnight and 1:00 A.M. on the morning of August 19, 1959, in Room 9, Marco Courts, near Hattiesburg, Mississippi. Patrolman Duckworth had been requested to find appellant and another man. Duckworth got in touch with another patrolman and they met at about 11:00 P.M. on Tuesday night, August 18, 1959, and began a search of various motor courts and other places. The patrolmen were not expecting any trouble. Patrolman Ray, who was with Duckworth, did not know appellant was one of the persons Duckworth was looking for and Duckworth referred to appellant only as a friend. The two patrolmen arrived at the Marco Courts just after midnight, and when it was found that appellant was in Room 9, they drove to that unit. Duckworth told Ray that he would be back in a few minutes and then went to Room 9 and knocked on the door in sight of Ray who stayed in the patrol car. The door opened and Duckworth went in the room. In about five minutes, Duckworth ran out of the room and fell. Ray saw blood on Duckworth and saw that he was not wearing his belt and pistol as he was when he entered the room. Ray put Duckworth in the patrol car and then saw appellant standing at the door of Room 9. Appellant stated, ''I will teach him to come check on me, take him on to the hospital, I don't think he is hurt too

bad anyway.'' Ray drew his gun to shoot appellant and Duckworth said, ''Don't shoot, don't shoot.'' Duckworth asked to be taken to the hospital as he needed help. Duckworth was dead when he reached the hospital, having been shot. The missile entered his back just below the tip of the right shoulder blade and came out just below the left breast nipple.

After Duckworth was taken to the hospital, a number of officers went back to the Marco Courts. A number of telephone calls were made from the office to appellant demanding that he come out unarmed. Appellant told the officers he had called the F.B.I. and others who would be out there in a little while. He did call John Gregg at Jackson and told him that Duckworth thought a lot of him, Gregg, and that he had just shot Duckworth with a 38 revolver (he was shot with a 22 calibre revolver). Appellant came out of the room after two or three hours. He was dressed and was wearing Duckworth's ''Sam Brown'' belt with Duckworth's pistol in it. He was also wearing a loaded 22 revolver and a scabbard with a knife in it. He was carrying a handkerchief and a pair of handcuffs in his hands. He gave the weapons to the sheriff and offered no resistance. He told the officers when he came out of the room that when Duckworth visits him he always removes his gun, that he did not know what was wrong with Duckworth because he hesitated to remove his gun. He also stated that after a while Duckworth removed his gun. Appellant was asked if Duckworth was shot with the 22-calibre revolver, and he answered: ''Let's put it this way, that is the gun that was in my hand when Duckworth was shot.'' Appellant then said he knew his rights and did not want to answer any further questions. On the way to jail, appellant carried on a cool and coherent conversation about politics and made no reference to the tragedy.

Appellant entered a plea of not guilty by reason of insanity. No suggestion of insanity at the time of trial was made during the trial.

After the State rested, the defense called numerous witnesses on the issue of appellant's sanity. To detail all the proof in this regard would unduly lengthen this opinion. We shall summarize what was shown.

As early as 1957, when appellant was working for an insurance company, he began to engage in meaningless and incoherent conversations and to write reports that made no sense. Two of these reached the company's home office and appear in the record. Appellant began making, and made many, memoranda that made no sense, and a great many of these were signed "13". Appellant's superior would ask about the symbol "13" and all he ever got out of appellant was that "they know." By March 1958, appellant's condition was worse; he could do no work and would sit around the insurance office writing meaningless memoranda and staring at the walls; he would not talk. The office force thought he was mentally sick and his superior requested that appellant allow them to have him treated by a physician. Appellant refused treatment and he was asked to resign because his superior and co-workers were afraid he would either kill someone or kill himself.

In the meantime, beginning in January 1958, appellant began sending "reports" to Mr. Bush, one of the assistants to the United States Attorney. The long so-called "reports" were meaningless, incoherent, and filled with trivial and senseless handprinted words. Mr. Bush testified that he could make no sense whatever out of them. Many were signed or contained the symbols "0-0" and "13". Appellant once called Mr. Bush and told him that appellant was on a secret investigation, was in danger of his life, and the reports he was sending would become useful in the future. These reports were shown to the Jackson Police Department. Finally, Mr. Bush called appellant to his office and told him that he could not understand the so-called "reports" and requested that he stop sending them. Appellant was astounded that Mr. Bush could not find violation of the

law in the reports. A large mass of the "reports" were introduced in evidence and appear in the record here in original form, and it is safe to state that there is no sense whatever in them, and any reasonable person would conclude that no rational mind could have conceived to write them.

About April or May 1958, appellant went to the University of Mississippi and visited the Dean of the Law School and Professor Fox. Shortly before that time, appellant had written a letter to a former law professor requesting that the latter become his general counsel on a big oil deal that appellant was working on; but at that time, appellant was out of work. When he talked to the Law Professors, he had a brief case which he constantly referred to as containing all information about his oil interests. He stated that a Hindu Potentate had given him the brief case; that he had a number of south Mississippi Counties tied up for oil, and the big oil companies were fighting him; that the oil companies had employed the F.B.I. and the State Police, and these agencies had kidnapped appellant's wife and set her up as a prostitute in New Orleans as the head of a ring bringing in girls from Mississippi to New Orleans. The law professors could make no sense out of appellant's conversation during the long talks each had with him. The professors were so alarmed they made arrangements to have appellant's friends watch him and see if he needed treatment.

On Thursday preceding the Wednesday morning when Duckworth was killed, appellant was in the Hattiesburg office of the Barnett Campaign. Mrs. Fleming, State Director of Women, had been to the Coast and arrived at the office late in the afternoon. When Mrs. Fleming, who was not working under appellant, went into the office where appellant was appellant ordered her to give a minute by minute account of her activities, with great detail as to where she was and who she saw and if she was seen by others at the various places she had been.

He also wanted to know if Mrs. Fleming could prove she was at this place and that place. Appellant had a bad appearance, and his conversation and questions were completely irrational. Appellant took copious notes of her answers to every question. Mrs. Fleming was greatly alarmed at appellant's irrational behavior and drove alone at night directly to John Gregg's home in Jackson to report the matter.

On Friday morning preceding the killing, Buddy Gregg, a co-worker in the Barnett Campaign, stayed in the same room with appellant at the Marco Courts in Hattiesburg. Appellant woke Buddy Gregg at 5:00 A.M. and said Eisenhower had sent him down to investigate integration at Little Rock. Appellant then left for Jackson. Appellant called Buddy Gregg at 4:30 A.M. the next day and told him to go to Taylorsville and get appellant's brother to give him an Italian Pistola and to get a "Long Tom" from appellant's father and bring them to the Belmont Cafe in Jackson because "the quarterback deal in the Belmont Cafe is ready." Buddy Gregg did not go to Taylorsville, but went to Jackson, where he saw appellant at a motel and appellant told Buddy Gregg that Eisenhower had sent him to investigate Little Rock and that Mrs. Fleming had integrated Little Rock and caused all the trouble there. On Monday immediately preceding the killing, appellant requested Allison James, a Barnett Campaign worker at Hattiesburg, to take appellant's automobile to Jackson and exchange it. Appellant engaged in irrational talk and behavior. When James returned from Jackson, he was in a motel room with appellant for about one and a half hours. Appellant showed James a medallion on a key chain and told James that it was the key to the Vatican and would unlock the Pope's front door; that appellant had contact with the Italian underworld and that money in unlimited quantities was available. Appellant had burned the ends of James' bow tie and said he did it in order to locate James. Appellant then took out a loaded

pistol and had James smell it. Appellant handled, twirled, and pointed the pistol to the great alarm of James, who was trying to get out of the room but was not allowed by appellant to do so. Appellant also had a knife in a scabbard which, although it was stamped ''Made in Japan'', he claimed was sterling silver and had been made by Jim Bowie and was used at Custer's Last Stand. Appellant also stated that he was part Cherokee Indian but his parents did not know it.

Appellant also told James that Mrs. Fleming was a Communist who had integrated Little Rock. This witness finally got away from appellant and called Jackson headquarters to report the matter.

Others testified to appellant's irrational behavior, and all were of the opinion that appellant was insane and did not know the difference between right and wrong.

Dr. Claude L. Brown, of Mobile, Alabama, whom the State admitted was a qualified specialist in the field of psychiatry, after examining appellant for a period of about forty-five minutes to an hour, and after having been asked a lengthy hypothetical question based on the evidence, stated that he was positively of the opinion the appellant was insane at the time of the killing and did not know the difference between right and wrong. His diagnosis was ''profound schizophrenic psychosis, paranoid type.'' He also stated that appellant was insane at the time of the trial.

After appellant rested his case, the State introduced six witnesses who had seen and talked with appellant at various times prior to the date of the killing, and all thought appellant was normal and sane. Several of these witnesses had little opportunity to observe appellant. The testimony of these witnesses showed only that appellant appeared at times to be normal, a fact not denied by appellant's counsel. The State also introduced a member of the Whitfield Staff who had been in that position for something over three years after finishing his interneship. He had not examined appellant and

would not make any diagnosis of him. He was introduced for the purpose of testifying that it takes from two to four weeks to make a diagnosis of a patient's mental condition, a fact denied by Dr. Brown. He would not say that Dr. Brown's diagnosis was incorrect.

John Gregg, who was Barnett's Campaign Manager, and who had known appellant all his life, testified that when he hired appellant as a field wroker for the Barnett Campaign, appellant was normal and carried on a rational conversation; that he dealt with him once a week during the campaign, and had weekly meetings lasting three or four hours, the last of which was on August 9, 1959, in Jackson, and he noticed nothing unusual or abnormal about appellant. Gregg stated that on August 18, 1959, he had lunch with appellant and visited with him for about one and a half hours and appellant carried on a normal business conversation during the meal; but that appellant was obviously very tired, and was greatly disturbed about the welfare of his daughter, who was supposed to be seriously ill. Gregg further testified that he told appellant to take off from work and see about his daughter.

Appellant first contends that the lower court erred in granting the State the following instruction: "The Court instructs the Jury for the State that in the event you should find the defendant not guilty by reason of insanity and certify that he is dangerous, to the community, then it would be the duty of the Court to commit him to the asylum until such time as he regained his sanity at which time he would go free."

The giving of this instruction was error. This Court held that the giving of a similar instruction, which was much less unfavorable to the accused, was error in the case of Nelson v. State, 129 Miss. 288, 92 So. 66. See also Mississippi Jury Instructions, Alexander, Section 2661, page 610. This instruction is not in accordance with the provisions of Section 2575, Mississippi Code of 1942, which provides that if a person indicted for an

offense and is acquitted on the ground of insanity the jury shall state therein such ground, and whether the accused has since been restored to his reason, and whether he be dangerous to the community. It then provides: "And if the jury certify that such person is still insane and dangerous the judge shall order him to be conveyed to and confined in one of the State asylums for the insane."

The instruction complained of told the jury in effect that a verdict of not guilty on the grounds of insanity would result in freeing the accused. It is very probable that this erroneous instruction was partly responsible for the verdict in this case.

 Appellant next contends that the verdict was contrary to the overwhelming weight of the evidence. In 1879, this Court, in the case of Cunningham v. State, 56 Miss. 269, stated the following: "We think the true rule is this: Every man is presumed to be sane, and, in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered; but whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender such doubt, it devolves upon the State to remove it, and to establish the sanity of the prisoner to the satisfaction of the jury, beyond all reasonable doubt arising out of all the evidence in the case. Pollard v. The State, 53 Miss. 410; The People v. McCann, 16 N. Y. 58; The State v. Bartlett, 43 N. H. 224; The State v. Crawford, 11 Kan. 32; Polk v. The State, 19 Ind. 170; Hopps v. The State, 31 Ill. 385; Ogletree v. The State, 28 Ala. (n.s.) 701." The Cunningham case stated the rule as it is today in this State. Waycaster v. State, 185 Miss. 25, 187 So. 205.

 Applying the rule just stated to this case, we are of the opinion that the State failed to meet the burden placed upon it to show that appellant was sane at the time of the commission of the offense with which appellant was charged, and that the verdict was contrary

to the overwhelming weight of the evidence. The evidence offered by appellant on the insanity issue showed without dispute that over a period of at least a year and a half appellant had periods of time when he suffered hallucinations and delusions and was completely irrational, although at other times he was normal. It showed that for some days before the killing he was suffering from delusions of the most irrational nature. Those most intimately connected with him were alarmed. Appellant apparently slept little. In addition, the admittedly qualified psychiatrist was positively of the opinion that appellant was insane at the time of the killing and at the time of the trial. The State made what amounted to little more than a token effort to meet the burden of proving appellant was sane. It offered no medical opinion on appellant's sanity. The physician it did offer had not examined appellant and did not give an opinion on the sanity question. Even when viewed in the light most favorable to the State, it is our opinion that consideration of the evidence will overwhelmingly convince any objective mind that appellant was insane at the time of the killing. It should also be mentioned that the State does not contend that appellant was drinking intoxicants at any time.

■■ ■ Appellant made a motion for new trial on the ground, among others, of newly discovered evidence. The proof on motion for new trial offered by appellant consisted of the testimony of the four attorneys who represented appellant and seven people connected with the Barnett Campaign Headquarters at Jackson, none of whom testified at the trial on the merits. Their testimony is not contradicted.

Judge Malcolm B. Montgomery, law partner of Governor Barnett, testified that John Gregg, Campaign Manager, called him just before noon on Monday before the killing the following Tuesday night. Gregg informed Judge Montgomery that appellant had created disturbances and uneasiness, and that he, Gregg, thought appel-

lant should be placed in the insane asylum; that Gregg had appellant at a motel in Jackson but appellant would not stay there. The result of this thirty-minute conversation was that Gregg would try to get appellant's brother to take charge and care for appellant.

C. C. Davis, treasurer of the Barnett Campaign, testified that appellant had created a disturbance in the headquarters on Monday morning preceding the killing; and that appellant's actions were abnormal; that the following morning a meeting was had in the headquarters, attended by seven of the leading people in the Barnett Campaign; that the purpose of the meeting was about appellant's sanity. All of those attending the meeting were concerned about appellant returning to the headquarters. John Gregg advised them that he had appellant in the hands of appellant's brother and not to worry about it.

Walter Johnson, associate manager of the Barnett Campaign, had a conversation with appellant midmorning of Monday. Witness had received a call from appellant that morning and appellant told witness that it was too bad Admiral Halsey had passed away, that appellant had a sword that belonged to Admiral Halsey and the Admiral never made a move during the war without consulting appellant. Appellant also told Johnson that Eisenhower was for Barnett and they could draw a draft on the government for any amount of money; he talked of a big oil deal, and said that two members of the Italian Mafia were downstairs with a million dollars in a black bag. Appellant's conversation was not rational. Johnson was instrumental in calling the meeting the following morning about appellant's sanity, and whether to put appellant in the asylum.

Erle Johnston, publicity manager of the Barnett Campaign, testified that appellant had created a disturbance in his office Monday morning before the homicide, and that he attended the meeting Tuesday morning when the discussion took place as to whether an attempt should

be made to put appellant in Whitfield, and that those at the meeting were swapping information about what appellant had done and said. An attorney present stated that he would handle the papers and do it quietly, whereupon John Gregg stated that he had gotten appellant's brother to take appellant home with him and keep him in his custody. No one objected to this course of handling the matter.

Three other witnesses testified. They were all connected with the State Campaign Headquarters and told of appellant's statements and actions and about the meeting Tuesday morning concerning appellant's sanity, and what was done at that meeting.

The three Hattiesburg attorneys who represented appellant testified that they knew nothing of the availability of the witnesses who testified on the motion for new trial, and had no reason, in the exercise of reasonable diligence, to call any of these witnesses. Carey Bufkin, one of appellant's attorneys, testified that he had been on active duty in the armed forces and got home about August 29, 1959; that in response to a telephone call from a friend, he went to see appellant and then contacted Mr. Wingo and the Curries' to be associated with him in defending appellant. Bufkin stated that the reason he did not know of and did not call any of the witnesses connected with the Barnett State Headquarters was that he talked to John Gregg after the preliminary hearing and after the question of appellant's sanity had come up, and John Gregg told him that he knew nothing about that at all, referring to appellant's sanity; that John Gregg told Bufkin that he was interested in appellant as a lifelong friend and would make inquiry among the various and sundry people that he had known to see if there was any evidence that would be useful to the defense. Gregg promised Bufkin he would furnish him any useful evidence that was available. Bufkin further stated that John Gregg never gave him any information

about appellant's actions and statements at the State Campaign Headquarters.

The rule for the allowance of a motion for a new trial on the basis of newly discovered evidence is stated in Townsel v. State, 228 Miss. 110, 87 So. 2d 481, as follows:

"A concise statement of the criteria to be considered on a motion for a new trial is in 39 Am. Jur., New Trial, Section 158: 'To warrant the granting of a new trial on the ground of newly discovered evidence, it must appear that the evidence is such as will probably change the result if a new trial is granted, that it has been discovered since the trial, that it could not have been discovered before the trial by the exercise of due diligence, that it is material to the issue, and that it is not merely cumulative, or impeaching.' "

As already noted, the evidence introduced on the trial was overwhelming that appellant was insane at the time of the commission of the offense. It is probable that if the testimony of the witnesses who testified on the motion for a new trial had been available at the trial, the verdict would have been different. We are also of the opinion that the testimony of the witnesses who testified on the motion for a new trial would not have been discovered by the appellant's attorneys before the trial in the exercise of reasonable diligence.

We are of the opinion that the testimony shown to have been discovered after the trial was vital to the issue of insanity and not merely cumulative or impeaching, and probably would have changed the result if the jury had had the benefit of the testimony of these witnesses. Accordingly, we are of the opinion that the lower court erred in overruling the motion for a new trial.

For the errors herein mentioned, the case should be and is reversed and remanded for a new trial.

Appellant also raises the question that the defendant was deprived of due process of law because he was tried when he was presently insane and incapable of rationally participating in his defense. We do not think it is neces-

sary to consider this assignment of error. Upon remand, appellant's then condition may or may not warrant a suggestion of present insanity. If it is suggested, the trial court will take appropriate steps to determine appellant's condition before retrial. In this connection, House Bill No. 668, Laws of 1960, was signed by the Governor on May 11, 1960, and takes effect sixty days after its passage. This law is as follows:

"In any criminal action in the circuit court in which the mental condition of a person indicted for a felony is in question, the court or judge in vacation on motion duly made by the defendant, the district attorney or on the motion of the court or judge, may order such person to submit to a mental examination by a competent psychiatrist selected by the court to determine his ability to make a defense; provided, however, any cost or expense in connection with such mental examination shall be paid by the county in which such criminal action is pending."

Reversed and remanded.

All Justices concur, except *Roberds, Holmes* and *Arrington, JJ.,* who took no part.