# IN THE COURT OF APPEALS 10/01/96

# OF THE

# STATE OF MISSISSIPPI

## NO. 93-KA-01462 COA

**DENNIS EARL COLE**

**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**

**APPELLEE**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. LARRY EUGENE ROBERTS

COURT FROM WHICH APPEALED: LAUDERDALE COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT:

JAMES A. WILLIAMS

ATTORNEYS FOR APPELLEE:

OFFICE OF THE ATTORNEY GENREAL

BY: JOLENE M. LOWRY

DISTRICT ATTORNEY: BILBO MITCHELL

NATURE OF THE CASE: CRIMINAL - KIDNAPPING AND AGGRAVATED ASSAULT

TRIAL COURT DISPOSITION: APPELLANT CONVICTED OF BOTH CRIMES AND SENTENCED TO SERVE THIRTY YEARS WITH TEN YEARS SUSPENDED TO BE FOLLOWED BY FIVE YEARS ON PROBATION FOR KIDNAPPING AND TWENTY YEARS FOR AGGRAVATED ASSAULT TO RUN CONCURRENTLY WITH THE SENTENCE FOR KIDNAPPING

BEFORE FRAISER, C.J., COLEMAN, AND KING, JJ.

COLEMAN, J., FOR THE COURT:

A grand jury in Lauderdale County indicted Appellant, Dennis Earl Cole, for the commission of three felonies: (1) attempted murder of Reginald Neely, (2) aggravated assault on Cole's wife, Lavesa Cole, and (3) kidnapping of Lavesa Cole. When the State rested, it moved to dismiss the charge of attempted murder of Reginald Neely, which motion the trial court sustained. The jury convicted Cole of the remaining two felonies of aggravated assault on and kidnapping of Lavesa Cole, Dennis Earl Cole's wife. The trial court sentenced Cole to serve a term of thirty years in the Mississippi Department of Corrections with ten years suspended and five years on probation after completing this sentence for the felony of kidnapping and a term of twenty years on the felony of aggravated assault, the latter sentence to run concurrently with the sentence for kidnapping. In his appeal, Cole poses five issues for this Court's consideration, analysis, and resolution. We affirm the trial court's judgment of Cole's guilt of kidnapping and its sentence of thirty years in the Mississippi Department of Corrections with ten years suspended and five years on probation after completing this sentence for the felony of kidnapping. Because there was a variance between the elements of aggravated assault as the indictment charged Cole and as the State's instruction explained them to the jury, which we find to be plain error, we reverse and remand the trial court's judgment of Cole's guilt of aggravated assault.

## I. Facts

The Appellant, Dennis Earl Cole, married Lavesa Cole on January 15, 1992. When they married, Lavesa Cole was the mother of one child, a daughter, whose name was Sky. Reginald Neely was Sky's father; but he and Lavesa Cole never married. On or about February 9, 1993, Cole and his wife Lavesa separated. On February 18, 1993, Appellant Cole entered his plea of guilty to an indictment for the crime of burglary of a Rex electronics store in Meridian. The saga which resulted in Cole's triple indictment for attempted murder, kidnapping, and aggravated assault occurred three days later on the night of February 21, 1993.

Earlier that day, February 21, Cole had visited his wife at her mother's house located at 1927 20th Street in Meridian to discuss their separation and proposed divorce. Later that night Cole came to a hospital in Meridian where Lavesa Cole's mother was a patient; but Lavesa Cole testified that she and her husband did not "say anything to each other." Cole left the hospital with Lavesa Cole's sister's ex-boyfriend at about nine o'clock that evening. As Lavesa Cole and her sister were leaving the parking lot at the hospital to return to their mother's home, Sky told her mother that she saw Cole driving a car in the hospital parking lot. Lavesa testified that she was not sure that it was Cole because the car's lights were not on.

On their way to their mother's home, Lavesa Cole and her sister stopped by the Mississippi Employment Security Commission office so that her sister could drop off her claim by slipping it under the door of the office, which was closed at that hour of the night. When Lavesa Cole and her sister arrived at their mother's home, they each put their children to bed, and then they went to bed. Dennis Cole came to his wife's mother's house after his wife and her sister had gone to bed and

knocked on the door. Lavesa Cole responded to her husband's knock by telling him to leave and suggesting that she would call the police if he didn't leave. According to Lavesa Cole's testimony, her husband pretended to leave. Next, Reginald Neely, Sky's father, drove his pick-up to Lavesa Cole's mother's house, perhaps in response to Lavesa Cole's telephone call after Dennis Cole had left.

After Neely arrived in his pick-up, Lavesa Cole left her mother's house and got into the pick-up with Neely. After Neely drove about a half a block down the street, Dennis Cole, stood up in the back of Neely's pick-up with what Lavesa Cole and Neely thought was a gun in his hand. Neely's pick-up had a sliding glass partition in the rear window of the cab, which apparently was open. Lavesa Cole described what happened next in the following testimony:

A. And that's when I got out and Reg got out and he went one way and then I was going up a hill and that's when Dennis came behind me.

Q. Okay. Reginald stopped the truck?

A. Well, no, not really.

Q. You got out with the truck moving?

A. Uh-huh.

Q. And Reginald got out with the truck moving?

A. Yes.

Q. Even though he was driving?

A. Yes.

Q. Okay. And Dennis jumped out with the truck moving.

A. Yeah. He jumped off.

Q. And I believe you said he followed you instead of following Reginald?

A. Right.

Q. What, did the truck crash?

A. It ran into a stop sign and that's what stopped the truck.

When Dennis Cole caught up with his wife, they began fighting. According to Lavesa Cole's version of the evening's unfolding events, "that's when he hit me [on the forehead] with [the butt of a] gun and bit me." The resulting wound required thirteen stitches to close. She described the gun as a nine-millimeter pistol which looked "pretty long" to her. According to his wife, Dennis Cole also hit her about ten times with his fists. Cole then bit his wife on her left jaw. When Melvin Glenn Moore

arrived on the scene, he told Cole to stop, that he had messed up his wife's face. In response to Moore's intervention on behalf of Lavesa Cole, Dennis Cole "turned around and pointed the gun at Melvin." Melvin "threw up his hands, and he left."

Dennis Cole forced his wife to accompany him up the hill where he coerced her into entering a school bus parked on 22nd Avenue. Once they were inside the bus, Cole ordered his wife at gunpoint to disrobe, which she did; and then he engaged in sexual intercourse with her "to make a baby." After the sexual activity, Lavesa Cole asked if she could put on her clothes, to which her husband consented. He asked her to lay back down after she had dressed. Then, according to his wife's testimony, Dennis Cole saw the police cars pull up at both ends of the parked school bus. Meridian police lieutenant John Nelson came to the side of the bus and began to talk to Dennis Cole through the open bus window. When he saw the police cars, Dennis Cole got down on the floor of the bus. According to his wife's testimony, Cole then reached over her, and the gun went off while he was holding it in his right hand. The bullet struck her in the left side of her face and exited from the back of her neck.

Dennis Cole had earlier asked Lieutenant Nelson to call his mother. She arrived at the school bus about the time her son shot Lavesa Cole. When his mother told her son Dennis that she couldn't help him "like this," Dennis Cole shot himself in the leg. Lavesa Cole estimated that perhaps forty five minutes elapsed between the time her husband shot her and then shot himself. After he shot himself, Dennis Cole dropped the gun, and Lavesa Cole picked it up and threw it out the window. Just after she threw the gun through the window, the police stormed the school bus. One officer picked up Lavesa Cole, and she was taken to a hospital in Meridian. The police also arrested Dennis Cole. Thus, the siege ended.

## II. Trial

The indictment by which the grand jury on Lauderdale County charged Cole with aggravated assault read in part as follows:

> The Grand Jury for the State of Mississippi . . . upon their oaths present that:

DENNIS EARL COLE

as a part of a common scheme of

as a part of the same occurrence or transaction

. . . did unlawfully, feloniously, and knowingly and purposely cause serious bodily injury to another, Lavesa R. Cole, with a deadly weapon, to-wit: a 9MM handgun, by shooting her,

in violation of Section 97-3-7(2) of the Mississippi Code Annotated as amended . . . .

Without objection from Cole's counsel, the State submitted, and the trial court granted, the following instruction, in which the State defined the elements of the crime of aggravated assault, all of which the jury must find Cole to have committed, before it could return a verdict of guilty of aggravated assault:

INSTRUCTION S-2

The Court instructs the Jury that should you find from the evidence in this case, beyond a reasonable doubt that:

1. On or about the 21st day of February, 1993, in Lauderdale County, Mississippi;

2. That defendant, Dennis Earl Cole, did purposely, knowingly or recklessly under circumstances manifesting an extreme indifference to the value of human life cause bodily injury to Lavesa Cole;

3. With a deadly weapon, a handgun, by shooting her, and

4. That the Defendant was not laboring under such defect of reason from disease of mind as to know the nature and quality of the act he was doing, or, if he did know it, that he did know what he was doing was wrong; then it is your sworn duty to find the Defendant guilty of AGGRAVATED ASSAULT under Count II.

Should the State fail to prove any one (1) of more of these essential elements, beyond a reasonable doubt, then you shall find the Defendant not guilty of AGGRAVATED ASSAULT under Count II.


Insanity was Cole's fortress of defense to both charges of kidnapping and aggravated assault, although with regard to aggravated assault only, his counsel flirted with the defense that Cole's shooting his wife was an accident. We reserve further discussion of what occurred at the trial for our analysis and resolution of the issues which Cole has raised for our review in his appeal.

We note that after the Mississippi Supreme Court had docketed this appeal on or about December 29, 1993, Cole's trial counsel filed a motion in that court to withdraw as his trial counsel because Cole had not paid her fee as he and his family had agreed. His counsel also filed Cole's affidavit of poverty and motion to proceed *in forma pauperis* in the supreme court. The supreme court responded to these motions by remanding this case to the trial court "for 45 days for the limited purpose of that court's determination and entry of an order indicating that Cole is entitled to *in forma pauperis* status and to appointment of counsel." On remand, the trial court entered its judgment granting leave to proceed *in forma pauperis* and appointing counsel. In its judgment the trial court adjudicated that Cole's present counsel was most familiar with the issues in this case and that it was not in Cole's best interest for her to be allowed to withdraw from representing him. It accordingly appointed her as counsel for the indigent Cole. Still later, Cole's counsel filed another motion in the Mississippi Supreme Court to withdraw as Cole's counsel because she was engaged in a campaign to be elected chancellor of the Twelfth Chancery Court District in the fall of 1994. The supreme court sustained that motion; hence Cole's representation in this appeal is by his present counsel, James A. Williams.

### III. Issues and the law

We quote verbatim Cole's expression of the five issues in the Statement of Issues found on page 1 of his brief, and we will consider them in the same order in which he has listed them in his Statement of Issues. We so explain because in his brief, Cole changes the order presentation of these issues for

argument, and he rewrites the issue as a slightly different proposition as his introduction to his argument on that issue. We adopt his order of presentation and language found in his Statement of Issues because Mississippi Rule of Appellate Procedure 28(a)(3) requires that such a Statement of Issues be included in a party's brief and explains the significance of the Statement of Issues with regard to the appellate court's consideration of those issues.

**Issue one:**

Whether a defendant pleading insanity is denied a fair trial, due process of law, right to counsel and the right of confrontation, when the State fails to disclose (1) the true possible mental disorder diagnosis and the results of a mental test its experts performed which was substantially similar and taken under similar circumstances, in results, while attacking the results of the same test performed by the defendant's mental expert.

**Issue two:**

Whether a defendant pleading insanity during a crime occurring three days after entry of a guilty plea which recited no mental problems is denied due process of law, the effective assistance of counsel, the right to confrontation and a fair trial, when the State, over objection, is allowed to probe defendant's expert concerning said guilty plea, without adequate preparation of the witness and the State's mental expert testifies such temporal connection was the foundation of his opinion of sanity at the time of the crime.

**Issue three:**

Whether a defendant pleading insanity during a crime occurring three days after entry of a guilty plea which recited no mental problems and an adjudication of sanity is denied due process of law and a fair trial by a jury instruction that requires the jury to first find a reasonable doubt of sanity to remove the presumption of sanity before it can require the State to prove sanity beyond a reasonable doubt and further recites that mental illness is not necessarily equated to insanity.

**Issue four:**

Whether a defendant pleading insanity is denied fundamental fairness, due process of law, equal protection of the law, a fair trial when the State during closing argument raises the specter that if the

jury finds the defendant not guilty by reason of insanity the defendant will be freed.

**Issue five:**

Whether a defendant pleading insanity is denied fundamental fairness, due process of law, a fair trial when the State is allowed to tell the jury that the defendant had a three-day old conviction of burglary when he committed the crime being tried.

**A. Issue one:**

Whether a defendant pleading insanity is denied a fair trial, due process of law, right to counsel and the right of confrontation, when the State fails to disclose (1) the true possible mental disorder diagnosis and the results of a mental test its experts performed which was substantially similar and taken under similar circumstances, in results, while attacking the results of the same test performed by the defendant's mental expert.

**1. Procedural background**

By its order dated March 4, 1993, the Circuit Court of Lauderdale County appointed David

A. Stephenson to represent Cole because it found Cole to be indigent. Notwithstanding that order of March 4, 1993, and in absence of any order in the record appointing him to represent Cole, Rogers J. Druhet, a Meridian attorney, wrote a letter to the district attorney to request that pursuant to Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice, the district attorney provide him, among other items, "(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial; . . .(4) Copy of crime lab reports or report of any test made; and . . . (6) Copy of any exculpatory material concerning the Defendant." The requested items were direct quotes from Rule 4.06 of the Uniform Criminal Rules for Circuit Court Practice which were then in effect. This letter was Druhet's only appearance anywhere in the record on behalf of Cole. On April 27, 1993, the trial court entered an order of arraignment and setting of case for trial and setting time for motions in which it included the name of Sarah Springer as Cole's attorney of record.

Two days later on April 29, Ms. Springer filed a motion for psychological examination and notice of insanity defense on behalf of Cole. In that motion, Cole Stated:

> 2. The Defendant has submitted to certain evaluating tests, including the Minnesota Multiphasic Personality Inventory-II, or MMPI-II, which is a tool frequently used by

psychologists and psychiatrists in the evaluation of a person suffering from mental illness.

3. The MMPI has detected a severe psychological disorder in the Defendant, and the most likely diagnosis for the Defendant is schizophrenia, possible paranoid type, or paranoid disorder.

The motion also informed the court that Jan Boggs, Ph. D., had examined Cole and had recommended that he be hospitalized for evaluation and treatment of his mental condition. The trial court granted Cole's motion by its order for mental examination and evaluation. In that order the court mandated that Cole be transported to the Mississippi State Hospital at Whitfield, and "there undergo psychiatric examination and evaluation for the purpose of determining his competency in regard to his ability to reasonably assist in his own defense in the trial of this cause as well as the degree of his sanity and legal sanity condition at the same time of the alleged offense charged in the indictment in this case."

On August 23, 1993, Reb McMichael, M. D., staff psychiatrist, and W. Criss Lott, Ph. D., clinical psychologist, at the Mississippi State Hospital, wrote a letter to the trial judge to relate and to explain the course of their examination of Cole pursuant to that order. A copy of this letter was filed in the court file, and the last page of the letter indicates that its authors mailed a copy of their letter to Cole's counsel, Ms. Stringer. In their letter Drs. McMichael and Lott included the following forensic opinions about Dennis Cole:

FORENSIC OPINIONS: We are unanimous in our opinion that Mr. Cole presently has the mental capacity to confer with an attorney with a reasonable degree of rational understanding and has a rational as well as factual understanding of the nature and object of the legal proceedings against him.

We are also unanimous in our opinion that Mr. Cole was not suffering from any disease of the mind at the time of the alleged offenses such that he would not have known the nature and quality of his acts or would not have known that these alleged acts would be wrong.

Cole's sole witness at his trial was Jan P. Boggs, Ph. D., a licensed psychologist and counselor. He ultimately expressed his opinion that Cole suffered from paranoid schizophrenia. He based his opinion on the results of Cole's answers to the Minnesota Multiphasic Personality Inventory-II, or MMPI-II, and his interviews with Cole. On cross-examination, Boggs elaborated on his diagnosis by stating, "I do not think [Cole] knew the difference between right and wrong at the time of his act." Dr. Boggs reaffirmed on cross-examination that in his opinion Cole was "competent to stand trial and participate in his own defense now."

On direct examination Dr. Boggs defended the MMPI-II as "a very useful and very reliable dependable instrument, particularly when used in connection with observation on the client and collection of history." Dr. Boggs opined that the results of the MMPI-II should be basically the same

if Cole was to take the test again within a reasonably brief time after he had administered it to him. Nevertheless, the State exhaustively cross-examined Dr. Boggs, and the MMPI-II was the primary, although not the only focus, of that cross-examination. The State emphasized in its cross-examination that the results of the final one-third of the test were suspect because Cole had started giving answers to the questions "just off the top of his head." Dr. Boggs described Cole's answers to the last one third of the test as "careless." The State inferred that Cole was "malingering" with his answers to the test in that he was trying to rig the results of the test by answering them subjectively. In its cross-examination of Dr. Boggs, the State mounted other attacks on the credibility of the results of the MMPI-II, which are too numerous to describe in this opinion.

Cole rested his case after his counsel and the State had completed their examination and cross-examination of Dr. Boggs. The State called Dr. Reb McMichael, the co-author of the letter to the trial judge dated August 23, 1993, to rebut Dr. Boggs' opinion that Cole was insane as defined by the *M'Naghten* Rule when he committed the crimes of kidnapping and aggravated assault for which he was being tried. Dr. McMichael opined that "[Cole] manifestly . . . was not experiencing any major organic mental disorder at the time that I examined him." Later Dr. McMichael further testified:

> We were unanimous in our opinion that Mr. Cole was not suffering from any major mental disorder which would have prevented him knowing right from wrong in relation to his actions at that time.

Dr. McMichael next described the diagnosis of Cole as follows:

> We gave him a diagnosis of alcohol abuse to reflect his continuing use of that substance despite all the problems that it had caused for him in the past and a diagnosis of personality disorder, not otherwise specified, with borderline features, which is "psych" speak for a personality characterized by dependence on others, anger, often violence, violence towards others, violence towards the self, impulsive behavior, intense feelings of rage, intense fear of abandonment and rejection.

Earlier Dr. McMichael had explained the use to which Dr. Lott had put the Minnesota Multiphasic Personality Inventory-II test. The record reveals this about Dr. McMichael's explanation:

> A. I believe that he also gave Mr. Cole an M.M.P.I.
>
> Q. That was after you had all discussed it and had your decision regarding the legal issues here?
>
> A. We thought we were pretty clear on the issues. Because of the information supplied to us and some of his responses on the previous M.M.P.I., Dr. Lott wanted to repeat it to see if that would change our opinion, looking for any other evidence that we may have missed in a clinical interview.

Q. Did it change your opinion?

> BY MS. SPRINGER: Your Honor, I'm going to object to any results of an M.M.P.I. This has not been provided to the defendant and I believe we would be entitled to review that before this witness goes into that information.
>
> BY THE COURT: The question was did it change your opinion?
>
> BY MR. ANGERO: Yes, sir.
>
> BY THE COURT: Do you intend on trying to introduce some --
>
> BY MR. ANGERO: No, sir.
>
> BY THE COURT: All right. Objection is overruled.

A. No, it did not.

Cole's counsel cross-examined Dr. McMichael about the value and accuracy of the Minnesota Multiphasic Personality Inventory-II test in the following way:

> Q. In your experience in being familiar with the M.M.P.I. test, have you found it to be reliable?
>
> A. It's a complicated question. Generally, yes. I have also found it to be of limited utility in forensic situations because, and again I'm not a psychologist, as far as I'm aware the main reliability of the M.M.P.I. is that so many other people similar to the person taking the test have taken the test, but as far as I'm aware, the M.M.P.I. was not standardized on a population of criminal defendants, so it's of limited utility in a forensic setting. It's of more utility in a clinical setting.
>
> Q. The M.M.P.I. would be valuable to a psychologist in a clinical setting evaluating a patient; would it not?
>
> A. It would be more valuable to a psychologist or a psychiatrist in a clinical setting than in a forensic setting.
>
> Q. As you testified, a forensic setting such as the practice that you have is limited, isn't it?
>
> A. Certainly.

In his motion for new trial, Cole assigned the following grounds to support his request for a new trial:

4. The court erred in allowing the State to use their expert in rebuttal without granting the defense an opportunity to review test results used by the expert (including but not limited to the MMPI test given to the Defendant at Whitfield); full disclosure would have allowed the defense to more effectively cross-examine the State's expert. Furthermore, on information and belief, the test results would be exculpatory in nature, supporting the Defendant's insanity defense.

To support his position on this matter, Cole submitted to the court as an exhibit a letter which Dr. Boggs wrote to the trial judge after the trial. In this letter Dr. Boggs wrote:

The results of the MMPI-2 [which Dr. Lott administered to Cole at Whitfield] are remarkably similar to the one that I administered to Dennis approximately five months earlier, on the heels of his arrest. I have superimposed the graphed results of these tests on one sheet and it is attached . . . . Both profiles are reported as valid with the latter one-third of the answers on both testings reported as answered in a random or careless manner. The first testing [Dr. Boggs'] reported diagnostic considerations of Schizophrenia, possibly Paranoid type, or a Paranoid Disorder; the second testing reported diagnostic considerations of Personality Disorder, probably Paranoid or Passive-Aggressive Personality; the possibility of a Paranoid Disorder was also suggested in the second testing. . . . None of the three testings suggests the diagnosis Personality Disorder, Not otherwise specified, with Borderline Features, given in the August 23, 1993, letter to you from Dr. McMichael and Dr. Lott.

Dr. Lott then wrote that he had received by fax about forty pages of documents to which he had not been privy, and that he was concerned about his not having had this information available to him or to Cole's attorney in the preparation of Cole's case or available to the trial court for its review during the trial. Nevertheless, the trial court denied Cole's motion for new trial.

**2. Application of the law to this procedural background**

Rule 4.06(a) of the Uniform Rules for Criminal Practice in the Circuit Courts read as follows:

Upon written request by the defendant, the prosecution shall disclose to each defendant or to his or her attorney, and permit him or her to inspect, copy, test, and photograph, *without the necessity of court order,* the following which is in the possession, custody, or control of the State, or the existence of which is known, or by the exercise of due diligence may become known, to the prosecution:

. . . .

(4) Any reports or Statements of experts, written, recorded, or otherwise preserved, made in connection with the particular case, . . . ." (emphasis added).

This Court finds filed in the clerk's papers a copy of a subpoena duces tecum issued for "Dr. Lott, or the proper custodian of records at Mississippi State Hospital . . . to give evidence in a certain matter under investigation . . . and then and there have all questions in the 'Minnesota Multi-phasic Personality Inventory-I' and 'Minnesota Multi-phasic Personality Inventory-II,' and other records, pertaining to Dennis Earl Cole, a Black male (Lauderdale County Circuit Court Cause No. 149-93)." This subpoena duces tecum was dated September 4, 1993, thirty days before October 4, 1993, the date that Cole's trial began. While there is no return of service endorsed on the copy, this Court finds that this subpoena duces tecum demonstrates that the State knew that Dr. Lott had used the MMPI to test Cole at least thirty days before his trial began.

This Court further finds that the letter from Rogers J. Druhet to the district attorney in which he requested him to furnish any "(4) Cop[ies] of crime lab reports or report of any test made" was sufficient to trigger the requirement that the State furnish a copy of the Minnesota Multiphasic Personality Inventory-II test which Dr. Lott had administered to Cole at the Mississippi State Hospital at Whitfield. The issue becomes whether Cole may place the trial court in error because it overruled his objection to the State's direct examination of Dr. McMichael when the State failed to furnish his counsel with the MMPI II which Dr. Lott administered to Cole.

We find the case of *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) to be apt authority on which to rest our resolution of this issue. In *Bagley*, the government failed to disclose the nature of its agreement with the two main witnesses against Bagley even though Bagley moved that the government furnish "any deals, promises or inducements made to witnesses in exchange for their testimony." *Bagley,* 105 S. Ct. at 3377. It later developed that the government had agreed to compensate these two witnesses for their testimony in return for their being paid $300.00. *Id.* at 3378. The district court, which had convicted Bagley in a bench trial, refused to vacate Bagley's sentence because it found that had the existence of those agreements been disclosed to it during Bagley's trial, they would not have affected its finding that the government had proved Bagley's guilt of the offenses for which he had been convicted; and it denied Bagley's motion to vacate his sentence. *Id.* at 3379.

Bagley appealed to the United States Court of Appeals for the Ninth Circuit, and that court reversed the district court's denial of Bagley's motion. About the Ninth Circuit's reason for reversing the district court's denial of Bagley's motion to vacate his sentence, the United States Supreme Court observed:

> The Court of Appeals apparently based its reversal, however, on the theory that the Government's failure to disclose the requested Brady information that respondent could have used to conduct an effective cross-examination impaired respondent's right to confront adverse witnesses. The court noted: "In *Davis v. Alaska*, ... the Supreme Court held that the denial of the 'right of effective cross-examination' was 'constitutional error of the first magnitude' 'requiring automatic reversal.'" 719 F.2d, at 1464 (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111, 39 L. Ed. 2d 347 (1974)) (emphasis added by Court of Appeals). In the last sentence of its opinion, the Court of Appeals concluded: "we hold that the government's failure to provide requested Brady information to Bagley so that he could effectively cross-examine two important government witnesses

requires an automatic reversal."

*Bagley*, 105 S. Ct. at 3379.

The Supreme Court declared that "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule." *Id.* at 3380. That is because impeachment evidence is "evidence favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* Further in its opinion, the Supreme Court opined:

> The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. As discussed above, such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt," *United States v. Agurs*, 427 U.S. at 112, 96 S. Ct. at 2401, a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

*Bagley*, 105 S. Ct. at 3381.

While the Supreme Court recognized three categories of prosecutorial failure to divulge evidence, *i. e.,* "no request," "general request," and "specific request," it found the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover all three categories. *Bagley*, 105 S. Ct. at 3383. The term "*Agurs* test" applies to the situation where the defense makes a specific request and the prosecutor fails to disclose responsive evidence. *Id.* The term "*Strickland* formulation" refers to the criteria adopted in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), in which the United States Supreme Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 104 S. Ct. at 2068; *see Bagley,* 105 S. Ct. at 3383.

The Supreme Court observed that the *Strickland* Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* In *Strickland*, the Supreme Court explained:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."

*Strickland*, 104 S. Ct. at 2068-69.

We conclude this tedious discussion of *Bagley* to note that the Supreme Court reversed the judgment of the court of appeals and remanded the case to that court "for a determination whether there is a reasonable probability that, had the inducement offered by the Government to [the two witnesses] been disclosed to the defense, the result of the trial would have been different." *Bagley,* 105 S. Ct. at 3385. Since we have held that the State was obligated to disclose the MMPI-II test results to Cole in response to Roger Druhet's letter to the district attorney, we must determine pursuant to *Bagley* whether there is a reasonable probability that, had the MMPI-II test results been disclosed to Cole, the result of the trial would have been different.

Cole does not suggest any basis on which to build a conclusion that the jury would have found him not guilty by reason of insanity, or, alternatively, been unable to reach a verdict, if the MMPI-II test results at the State hospital had been divulged. Cole only asks:

> Had Ms. Springer been allowed these disclosures and been allowed the hour that the District Attorney was given to review Boggs' case file, what might the jury verdict have been?

The heart of Cole's complaint on this issue is the following sentence found in his brief:

> Had this Whitfield MMPI been available on cross, all the State's attacks on Boggs would have been countered.

This Court interprets this sentence to mean that Cole really wanted these test results so that he might demonstrate that the results of a MMPI-II should be essentially the same if the subject of the test took it again. Even without the results in hand, Cole's counsel cross-examined Dr. McMichael about the MMPI-II test results. From the cross-examination that we previously quoted in this opinion, we determine that Dr. McMichael opined that while it was a complicated question, he generally found the MMPI-II results to be "generally reliable" although of little value in a forensic setting. On direct examination, Dr. McMichael testified that the results of the MMPI-II test which Dr. Lott had administered had not changed his opinion of Cole's diagnosis and ability to know the difference between right and wrong and to stand trial.

We conclude that even if the State had furnished Cole with the results of the MMPI-II which Dr. Lott administered at the State Hospital, which were quite similar to the results of Dr. Boggs' identical test, little would have changed in the "battle of the experts" which Drs. Boggs and McMichael waged. We note that not even Dr. Boggs attempted to interpret the results of Cole's MMPI-II test results to mean that Cole did not know the difference between right and wrong on the night of February 21, 1993, -- the relevant *M'Naghten* standard by which the jury was to determine if Cole was not guilty "by reason of insanity." We can only conclude that there is no reasonable probability that, had the MMPI-II test results been disclosed to Cole, the jury would have found Cole to be not guilty by reason of insanity, or even been unable to reach any verdict. Thus, we refuse to

put the trial court in error on this issue, which we resolve adversely to Cole.

**B. Issue two:**

Whether a defendant pleading insanity during a crime occurring three days after entry of a guilty plea which recited no mental problems is denied due process of law, the effective assistance of counsel, the right to confrontation and a fair trial, when the State, over objection, is allowed to probe defendant's expert concerning said guilty plea, without adequate preparation of the witness and the State's mental expert testifies such temporal connection was the foundation of his opinion of sanity at the time of the crime.

During the mid afternoon of the second day of trial, the trial court instructed the jury to retire to the jury room for a break. After the jury had left the court room, the district attorney made the following announcement to the trial judge:

> BY MR. MITCHELL: Judge, the State would like to make an ore tenus motion to be able to go into a prior felony of Dennis Earl Cole, burglary of a commercial building. There's a number of reasons that we feel like we would be able to do this. For one, the guilty plea was entered three days prior to the commission of the crime here. And in the guilty plea, Item No. 12 in his sworn document, [Cole] Stated, I do not claim to now be nor have I ever suffered from any type of mental disease or disorder, except: and he put "none." The second reason we think it's relevant to this case is that Dr. Boggs has Stated that he felt that the defendant has been suffering from paranoid schizophrenia since August of 1992, and the commission of this crime occurred on August 3rd, 1992, which leads me to believe that Dr. Boggs -- and I would like to ask Dr. Boggs about whether he formed that opinion because that's the time when the defendant started his criminal activity. And the third reason is because, as the Court well knows, that when a defendant takes the stand, the State of Mississippi is allowed now to use burglaries where someone is breaking in to steal as a crime of dishonesty, in which we can impeach the defendant's testimony. The defendant has made an announcement that he is not going to take the stand in this case, but Dr. Boggs has been on the stand telling the defendant's version of this and we have a right to impeach the defendant's version no matter where it's coming from.

The trial judge, the district attorney, the assistant district attorney, and Cole's defense counsel engaged in a lengthy discussion of the prejudice, probative value, and appropriate manner in which such testimony might best be elicited. Initially, the trial judge proposed:

> Tell you what I'm going to do, Mr. D.A., and I want to do this as carefully as I can because I have significant concern that whatever probative value this line of inquiry may have in an effort to attack the credibility of the opinion testimony of Dr. Boggs, the potential for the prejudicial effect is great. I don't want mentioned to the jury at this time anything about the defendant having previously been convicted of a felony offense. However, I would permit you to question Dr. Boggs about whether or not he was aware of the fact that the defendant had, under oath, three days prior to February the 21st, 1993, claimed in a court proceeding that he did not then and had not previously suffered from any mental disorder or mental condition.

Cole's counsel responded to this proposal by the trial judge by arguing that if anything at all went in about her client's conviction of burglary, she would be forced to try that case as well as the one before the court. The district attorney advised the trial judge that he intended to question Dr. McMichael about Cole's plea of guilty to the burglary charge three days before the events in question. After further discussion and argument, the trial judge ruled:

> I'm going to permit the State to get into this line of inquiry. I will, at your request, submit a limiting instruction to the jury which would effectively tell the jury that they could not consider any prior criminal conviction of the defendant as evidence justifying a verdict of guilty against him on a crime charged or crimes charged in this indictment. If you desire such an instruction, I will give a limiting instruction to the jury to that effect.

The district attorney asked Dr. Boggs if he was aware that Cole had sworn in his petition to accept his plea of guilty that he did not have any kind of mental problems and had never suffered from any mental problems. Dr. Boggs answered that he didn't "think [Cole] was aware of the mental problem . . . and had not sought treatment or received treatment." In response to further cross-examination on this point, Dr. Boggs testified that he was "aware that [Cole] did not consider himself to have a mental problem." Dr. Boggs' reconciliation of his opinion that Cole's insanity may have begun as early as August, 1992, with Cole's sworn Statement that he had no mental illness as of February 18, 1993, may or may not have seemed plausible to the jury; but Cole's Statement under oath that he "did not have any kind of mental problems and had never suffered from any mental problems" only three days before the night on which these events occurred was relevant to attempt to impeach Dr. Boggs' opinion that Cole was "*M'Naghten* insane" three days later.

As the trial court had indicated would be appropriate, Cole requested a limiting instruction, which read:

JURY INSTRUCTION D-10

The Court instructs the jury that the fact that Dennis Cole did not testify in this case may not be considered by you as evidence of his guilt nor may you draw any inferences therefrom. You are further instructed that any evidence in this case regarding any prior felony conviction of Dennis Cole may be considered by you only as it may relate to the issue of sanity at the time of the commission of the offenses.

The record reflects that Cole's counsel did not object to Jury Instruction D-10, although the State objected to it for several reasons which need not be recited here. When he granted the instruction, the trial judge Stated, *inter alia*:

I'll try to articulate, for the record, why I'm going to give this instruction. This is a peculiar set of circumstances because the defense is primarily one of insanity. The Ph.D. psychologist has testified and given his opinion that the defendant was *M'Naghten* insane on February 21st, 1993. Due to the nature of the practice of psychology, the psychologist must obtain verbal information from the patient, very detailed information about the patient's prior history, test results and assorted other information, to be able to give an opinion. I felt like that hearsay was admissible as an exception to the hearsay rule for Statements made by the patient to the doctor for the purpose of diagnosis and treatment of the condition of the patient. By necessity, evidence came out from Dr. Boggs about what the defendant had told him throughout his sessions with the defendant that permitted him or justified him in making a determination of *M'Naghten* insanity. The other side of the two-edged sword is that part of that information is that the defendant is a prior convicted felon to the point that three days prior to the alleged commission of these offenses, the 21st of February, that is, on February the 18th this defendant stood up before Judge Bailey in open court and entered a free and voluntary, apparently free, voluntary, and intelligent guilty plea to a felony. I want to try to remove, if possible through a jury instruction, any inference that the jury as laymen may tend to have to desire to convict this defendant solely based upon his prior criminal history or criminal record. *The purpose of this limiting language is to try to instruct the jury that the fact that the defendant may well be a prior convicted felon can only relate to the issue of his sanity or lack thereof on February 21st, 1993, and could not be considered and cannot be considered by them as any proof that he's a bad character or ought to be convicted of this offense because he previously pled guilty to a prior felon y.* I'm going to give it for those reasons. (emphasis added).

Cole's argument on this issue is somewhat lengthy and not entirely focused; but the gist of his argument is that the prejudicial nature of this earlier conviction far outweighed its probative value as impeachment of Dr. Boggs' opinion that Cole's mental illness had begun as early as August, 1992, and that three days after Cole made this Statement under oath, he had become *M'Naghten* insane. Among the cases which Cole cites in his argument on this issue are *Hunter v. State*, 489 So. 2d 1086 (Miss. 1986), and *White v. State*, 542 So. 2d 250 (Miss. 1989). We find these two cases dispositive of this issue.

In *Hunter v. State*, the appellant relied on insanity as his defense to the charge of having murdered his aunt, whom he thought was the devil's wife. *Hunter*, 489 So. 2d at 1090. Dr. Charlton Stanley, a forensic psychologist, testified for the State that Hunter was a paranoid schizophrenic but that he was *M'Naghten* sane and competent to stand trial. *Id.* at 1087. During the State's direct examination of Dr. Stanley, and over Hunter's objection, he testified about Hunter's conflicting Statements to him about Hunter's having killed his aunt and what happened afterwards. *Id.* at 1090. The Mississippi Supreme Court held that the trial court committed no error in permitting Dr. Stanley to testify about Hunter's Statements. *Id.* The supreme court opined:

> When a defendant relies upon the defense of insanity, the doors open for the admission of evidence of all kinds. Every act of the party's life is relative to the issue and is admissible in evidence.

*Id.* (citations omitted). *Hunter* renders Cole's sworn Statement admissible because as a previous act of his life, it became relevant to the issue of his sanity. This is particularly true because the act occurred only three days before the events which spawned the charges occurred.

In *White v. State*, Roosevelt White relied on insanity as his defense to the charge of having murdered his employer by having shot her three times in the face and neck. *White*, 542 So. 2d at 251. The appellant objected to the State's asking Dr. Guild, one of the State's experts, if his opinion that White was *M'Naghten* insane would change if he knew that White had been taking money and that White's victim was the *bookkeeper? Id.* at 254. The supreme court held that while this questioning was not appropriate without supporting proof by the State, any error had been cured by a limiting instruction which contained the following sentence: "If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark." *Id.* The supreme court opined: "Therefore, it being a presumption that jurors follow instructions presented to them, any error was harmless." *Id.*

The trial court did not err when it allowed the State to cross-examine Cole's expert, Dr. Boggs, about Cole's sworn Statement which he had made only three days before the events in question that he suffered from no mental illness and had not suffered from any mental illness preparatory to entering a plea of guilty to a charge of burglary and subsequently granted a limiting instruction that "any evidence in this case regarding any prior felony conviction of Dennis Cole may be considered by you only as it may relate to the issue of sanity at the time of the commission of the offenses." This Court presumes that the jury followed this instruction. We therefore resolve this issue adversely to Cole.

## C. Issue three:

Whether a defendant pleading insanity during a crime occurring three days after entry of a guilty plea which recited no mental problems and an adjudication of sanity is denied due process of law and a fair trial by a jury instruction that requires the jury to first find a reasonable doubt of sanity to remove the presumption of sanity before it can require the State to prove sanity beyond a reasonable doubt and further recites that mental illness is not necessarily equated to insanity.

The instruction about which Cole complains reads as follows:

INSTRUCTION S-4A

The Court instructs the jury that there is a presumption that every defendant is sane and, therefore, the burden is initially on the defendant to introduce evidence creating a reasonable doubt as to his sanity at the time of the act. If the defendant fails to introduce evidence creating a reasonable doubt as to his sanity, then you shall not consider this point.

If the defendant overcomes this initial burden, then, in order to find the defendant guilty under Count I and Count II, you must find beyond a reasonable doubt that on the 21st day of February, 1993, the defendant was not laboring under such defect of reason from disease of mind as to not know the nature and quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong. Stated more plainly, the test for insanity is whether the defendant was able to distinguish right from wrong at the time of the crime. The fact that a person is mentally ill does not necessarily mean that they are legally insane or that you should find them not guilty by reason of insanity.

In response to Cole's argument on this issue, the State reminds this Court that Cole's counsel did not object to the trial court's granting this instruction. The record discloses that when the trial court asked, "Any objections to the redrafted [instruction] S-4A?", Cole's counsel replied, "No."

In *Young v. State*, 420 So. 2d 1055 (Miss. 1982), the appellant's counsel argued that the trial court had erroneously granted a certain jury instruction. *Id*. at 1057. Young's counsel alleged that the lower court erred when it instructed the jury on its own motion that Young's fellow indictees were accomplices rather than "alleged accomplices." *Id*. He argued that the trial judge instructed the jury on a question of fact which the jury should have decided. *Id*. The supreme court noted that Young had not objected to the instruction after the court had amended and given it. *Id*. That court decided that issue adversely to Young because, as the court wrote:

> In *Reed v. State*, 237 Miss. 23, 30, 112 So. 2d 533, 535 (1959), we stated, "We will not reverse the trial court for an error created by the defendant's own instruction," and in *Bieller v. State*, 275 So. 2d 97, 99 (Miss. 1973), we held, "the acceptance of an instruction after its amendment by the trial court amounts to a waiver of an objection to the amendment." We therefore find Young's third assignment without merit.

*Young,* 420 So. 2d at 1057.

Cole's counsel's failure to object to the trial court's granting of Instruction S-4A waived his right to object to its granting this instruction, and we accordingly resolve this issue against Cole.

**D. Issue four:**

Whether a defendant pleading insanity is denied fundamental fairness, due process of law, equal protection of the law, a fair trial when the State during closing argument raises the specter that if the jury finds the Defendant not guilty by reason of insanity the Defendant will be freed.

Cole complains of the following argument which the assistant district attorney made in rebuttal to Cole's counsel's closing argument, in the final sentence of which she urged the jury to find Cole not guilty by reason of insanity:

> I guess after hearing the closing argument of defense counsel, on what I call the form of the verdict instruction, which is instruction S-5A, you can just forget about number four on each one of these counts because they deal with not guilty, just plain not guilty, not the choice of not guilty by reason of insanity. So the choices that you have in this case are the defendant is guilty of both of these counts or the defendant is not guilty by reason of insanity. If by some extreme leap of faith you decide that it is not guilty by reason of insanity, then you have three choices there. And I assume that since defense counsel didn't specify, I assume that what they want you to do is say the defendant was not guilty by reason of insanity but the defendant has been restored to his reason now and y'all should just let him go and walk the streets and we don't have to worry about him anymore. Or you have not guilty by reason of insanity and he has not been restored to his reason, in which case I don't know exactly what we do. Or not guilty by reason of insanity and he hasn't been restored to reason and he's a danger to the community. I don't know whether it specifies to which one of those they want, but I assume they want you to let him walk free.

In *Gambrell v. State*, 120 So. 2d 758, 762 (Miss. 1960), the Mississippi Supreme Court held that it was error for the trial court to have granted the following instruction for the State:

> The Court instructs the Jury for the State that in the event you should find the defendant not guilty by reason of insanity and certify that he is dangerous, to the community, then it would be the duty of the Court to commit him to the asylum until such time as he regained his sanity at which time he would go free.

The supreme court held that the instruction was "not in accordance with the provisions of Section 2575, Mississippi Code of 1942, which provided that if a person indicted for an offense and is acquitted on the ground of insanity the jury shall state therein such ground, and whether the accused has since been restored to his reason, and whether he be dangerous to the community." *Id.* It also observed that it "told the jury in effect that a verdict of not guilty on the grounds of insanity would result in freeing the accused. It is very probable that this erroneous instruction was partly responsible for the verdict [of appellant's guilt] in this case." For this and other errors, that court reversed and

remanded Gambrell's conviction of murder.

In *Smith v. State*, 220 So. 2d 313, 315 (Miss. 1969), the appellant complained of a nearly identical instruction which the trial court granted the State. In *Smith*, the district attorney "indulged in the following language over appellant's objection":

> And then to have the audacity, the brazen effrontery, to come before the jury of twelve fine citizens and say, 'Walk him out. . . . .walk him out.' Now, gentlemen, if you don't want to walk him out, let him go over here to the insane hospital, and when they announce he is restored to sanity, if it's two years, if it's two months, from that time he will be released upon the public.

By Mr. Prewitt: We object to that, Your honor, and take exception to his remarks.

*Id.* at 317. About this argument, the supreme court opined:

> We are of the opinion that this argument was completely unnecessary and could only result in prejudice to the defendant. We repeat, the issue before the jury was the defendant's sanity or insanity at the time of the shooting and not what disposition was to be made of him. The improper argument gave emphasis to the erroneous instruction referred to above and logically would operate to give the jury concern over whether the defendant would be placed back in society after a short period of confinement in the asylum. All of the justices except Robertson are of the opinion that the instruction, plus the improper argument, constitutes reversible error.

*Id.*

As before in the immediately preceding issue, Cole's counsel did not object to the previously quoted rebuttal argument which the assistant district attorney made. In *Box v. State*, 610 So. 2d 1148, 1153 (Miss. 1992), the district attorney Stated in his closing argument to the jury: "This doper over here, you can read from the lines, detests Mike Hutchinson." Appellant's counsel did not object to the district attorney's comment that his client was a "doper" when the comment was made. *Id.* Instead, he moved for a mistrial on that basis the following day after the jury had returned its verdict. *Id.* at 1153-54. The supreme court held that his motion for mistrial was too late. The supreme court opined: